**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 05-9002 and 05-9003
_____

SCOTT WAYNE BLYSTONE,

Appellant in 05-9002

v.

MARTIN HORN, Commissioner, Pennsylvania Department
of Corrections;
JAMES S. PRICE, Superintendent of the State Correctional
Institution at Greene; JOSEPH P. MAZURKIEWICZ,
Superintendent of the State Correctional Institution at
Rockview,

Appellants in 05-9003
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No. 99-cv-00490)
District Judge:  Hon. Gary L. Lancaster
_____

Argued April 27, 2011
Before: CHAGARES, NYGAARD, and ROTH, <u>Circuit Judges</u>.

(Filed December 22, 2011)

Maureen Kearney Rowley, Esq.
Samuel J.B. Angell, Esq. (Argued)
Federal Community Defender Office for the Eastern District
of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – Curtis Building
Independence Square West
Philadelphia, PA 19106

Robert Brett Dunham, Esq. (Argued)
Federal Public Defender Office for the Middle District
of Pennsylvania
100 Chestnut Street
Suite 300
Harrisburg, PA 17101

Paul D. Boas, Esq.
Law & Finance Building
Fifth Floor
429 Fourth Avenue
Pittsburgh, PA 15219
        <u>Attorneys for Appellant/Cross-Appellee</u>

Linda L. Kelly, Esq.
Richard A. Sheetz, Jr., Esq.
Amy Zapp, Esq. (Argued)
Stuart Suss, Esq.
Office of the Attorney General of Pennsylvania
Strawberry Square, 16th Floor
Harrisburg, PA 17120
          Attorneys for Appellee/Cross-Appellant

_____

OPINION

_____

CHAGARES, Circuit Judge.

In 1984, a jury sentenced Scott Wayne Blystone to death following his convictions in Pennsylvania state court for first-degree murder, robbery, conspiracy to commit murder, and conspiracy to commit robbery. After making several unsuccessful attempts to overturn his convictions and sentence in state court, Blystone filed the present petition for a writ of habeas corpus in the United States District Court for the Western District of Pennsylvania, alleging that both the guilt and penalty phases of his trial were infected with federal constitutional error and that he is entitled to a new trial or, at a minimum, a new sentencing hearing. The District Court denied relief on all guilt phase claims, but granted the writ as to Blystone's death sentence, finding that trial counsel was ineffective for failing to investigate, develop, or introduce expert mental health testimony and institutional records in mitigation, and that the state court's decision to the contrary was unreasonable. Accordingly, the District Court remanded the case for resentencing. Thereafter, Blystone filed a Fed. R.

Civ. P. 59(e) motion to alter or amend the judgment based on alleged newly discovered evidence of prosecutorial misconduct during the guilt phase of trial. The District Court denied the Rule 59(e) motion, concluding that the evidence submitted in support was not, in fact, "newly discovered."

Blystone now appeals the District Court's denial of his Rule 59(e) motion. The defendants (collectively, the "Commonwealth") cross-appeal the District Court's grant of penalty phase relief. Having approached this case with the utmost respect for the deferential standards of review that we are obligated to apply, we will affirm the judgment of the District Court.

## I.

### A.

On the morning of September 10, 1983, a passerby discovered the body of Dalton Charles Smithburger, Jr., lying near a road in Fayette County, Pennsylvania. Smithburger had sustained six gunshot wounds to the back of the head. "Blystone eluded detection as Smithburger's murderer for over three months. However, his associates eventually exposed him." Commonwealth v. Blystone, 549 A.2d 81, 84 (Pa. 1988) ("Blystone I"). First to contact the police was Miles Miller. Miller told the police that he had information implicating Blystone in Smithburger's murder and agreed to wear a tape recorder and transmitter during a meeting with Blystone in the hopes of eliciting a confession. In the course of this meeting, Blystone admitted to robbing Smithburger of thirteen dollars and then shooting him.

4

At trial, the Commonwealth introduced portions of Blystone's taped conversation with Miller into evidence. The jury heard Blystone's "own voice bragging in vivid and grisly detail of the killing of [Smithburger.]" Blystone I, 549 A.2d at 84. Blystone recounted that he had been out in his car with his girlfriend, Jackie Guthrie, his friend, George Powell, and Powell's girlfriend, Barbara Clark. In need of cash, Blystone picked up Smithburger, a hitchhiker, and asked him to contribute gas money. When Smithburger replied that he could only give him a few dollars, Blystone pulled out a gun and, in his own words, "almost splattered him right there in the car." Blystone then stopped driving and told Smithburger to get out. Having first led Smithburger away from the car, Blystone searched his belongings and found thirteen dollars. Blystone took the money and then ran back to the car to tell his friends that he was going to kill the hitchhiker. Upon making this pronouncement, Blystone immediately returned to where Smithburger stood and asked him to describe Blystone's car. Smithburger accurately described the car, so Blystone said "goodbye" and "wasted him." He proceeded to shoot Smithburger six times.

Barbara Clark's testimony at trial largely corroborated the story that Blystone recounted to Miller in the tape recorded conversation. She recalled that on September 9, 1983, Blystone offered Smithburger a ride and asked him for gas money. When Smithburger said he only had a couple of dollars, Blystone pulled out a gun on him. Clark heard six gun shots after the two men exited the car. Upon returning to the car, Blystone announced to his passengers that he had taken thirteen dollars from Smithburger. Jackie Guthrie's testimony corroborated Barbara Clark's in all respects.

5

Before resting its case, the Commonwealth also presented testimony establishing that the bullets retrieved from Smithburger's body were of the .22 caliber class, and that Blystone had stolen a .22 caliber pistol prior to the murder. Jackie Guthrie confirmed that the gun Blystone had stolen was the same gun he used to shoot Smithburger. Blystone called no witnesses and presented no evidence in his defense.

On June 13, 1984, a jury empaneled by the Court of Common Pleas of Fayette County, Pennsylvania, convicted Blystone of first-degree murder, robbery, conspiracy to commit murder, and conspiracy to commit robbery. Following the verdict, and outside of the jury's presence, Blystone's attorney, Jeffrey Whiteko, told the judge that Blystone wished to offer no evidence in mitigation at the penalty phase of the trial. Whiteko claimed to have had lengthy discussions with Blystone about the benefits of presenting a mitigation case. He asserted that he strongly objected to Blystone's decision and he expressed a desire to put Blystone and his parents on the stand at the sentencing phase of the trial.

Thereafter, the judge conducted a colloquy with Blystone in which he explained that the jury would determine the penalty and that the sentencing hearing was Blystone's only opportunity to present the jury with mitigating evidence. The judge explained the role that aggravating and mitigating circumstances would play in the jury's decision and informed Blystone that, while the prosecution had the burden of proving aggravating circumstances beyond a reasonable doubt, Blystone had the burden of proving mitigating

circumstances by a preponderance of the evidence. The judge then listed the statutory mitigating circumstances.

Noting that Blystone had an absolute right to remain silent, the judge asked him to consider the effect of his failure to present any mitigating evidence, and explained that he could not later argue that he did not have an opportunity to offer testimony. After taking a moment to confer with Whiteko, Blystone had the following exchange with the judge:

> JUDGE ADAMS: Do you wish to testify yourself or to have your parents testify or to offer any other evidence in this case?
>
> …
>
> MR. BLYSTONE: I have no testimony and no witnesses.
>
> JUDGE ADAMS: Either through yourself or anyone else?
>
> MR. BLYSTONE: No.
>
> …
>
> JUDGE ADAMS: Can you state for the record why it is that you do not want to offer any testimony?
>
> MR. BLYSTONE: I don't want anybody else brought into it.
>
> …

> JUDGE ADAMS:  Is that your only reason for not offering any testimony?
>
> DEFENDANT SHAKES HIS HEAD "YES."
>
> JUDGE ADAMS:  Of course, if you testify yourself that would not be bringing anyone into it except yourself, do you understand?
>
> MR. BLYSTONE:  Uh-huh.

Appendix ("App.") 970-72. At the conclusion of the colloquy, the judge stated for the record that he found Blystone to be an intelligent man who understood the consequences of his decision. The jurors then reentered the courtroom and the judge informed them that Blystone had chosen not to present mitigating evidence at sentencing. The judge reminded the jurors that Blystone had an absolute right to remain silent and instructed them to consider all evidence presented to them in the course of the trial to determine whether mitigating circumstances existed.

The Commonwealth argued that the jury should find, as an aggravating circumstance, that Blystone committed the murder in the perpetration of a felony, in accordance with the jury's verdict that Blystone was guilty of robbery. See 42 Pa. Cons. Stat. § 9711(d)(6). Whiteko argued against the penalty of death. The jury inevitably found one aggravating circumstance — that Blystone "committed a killing while in the perpetration of a felony," id. — and no mitigating circumstances. Accordingly, the jury imposed a death

8

sentence for the murder conviction, as required by Pennsylvania law under the circumstances. Id. § 9711(c)(1)(iv) ("[T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance[.]"). The judge imposed an independent sentence of ten to twenty years of imprisonment for the robbery conviction.

The Pennsylvania Supreme Court affirmed the conviction and sentence on direct appeal. Blystone I, 549 A.2d at 81. Thereafter, Blystone appealed to the United States Supreme Court, which granted certiorari to decide whether the mandatory aspect of the Pennsylvania death penalty statute impermissibly limited the jury's discretion in deciding the penalty, in violation of the constitution. Blystone v. Pennsylvania, 494 U.S. 299, 303 (1990). Rejecting Blystone's constitutional challenge, the Supreme Court affirmed the death sentence. Id.

B.

The Governor of Pennsylvania signed Blystone's death warrant in 1995 and, thereafter, Blystone retained post-conviction counsel, obtained a stay of execution, and filed a petition under the Post-Conviction Relief Act ("PCRA") in Pennsylvania state court, raising numerous claims for relief based on alleged constitutional defects in both the guilt and penalty phases of his trial. The PCRA court held an evidentiary hearing on Blystone's primary claim for ineffective assistance of counsel. A summary of the evidence presented at that hearing follows.

9

Whiteko, Blystone's trial lawyer, testified that he graduated law school in 1982 and, after completing a one-year judicial clerkship, began working part-time at the Public Defender's Office. He had only three months experience as a practicing attorney when he was appointed to this capital case. At the time of Blystone's June 1984 trial, Whiteko had represented criminal defendants in approximately twenty trials, none of them murder cases. Whiteko testified that the Chief Public Defender assisted him with the preliminary hearing and voir dire in Blystone's case, and that he had the help of an investigator to prepare for the guilt phase, but that he had no assistance in preparing for the sentencing phase of trial.

Whiteko knew that, if the jury found Blystone guilty of both murder and robbery, Blystone would automatically be subject to at least one statutory aggravating circumstance — committing the murder in the course of another felony. Nonetheless, Whiteko conducted an extremely limited investigation into the sort of potentially mitigating evidence that might have permitted the jury to avoid imposing the death penalty. Indeed, in preparation for the penalty phase, Whiteko interviewed, at most, four people: Blystone, his parents, and one of his sisters, whom Whiteko unintentionally encountered in the hallway of the courthouse during trial.

Whiteko told the PCRA court that he conducted the most extensive of these interviews with Blystone's father, Norman. After reading the list of statutory mitigating factors to Norman, Whiteko asked Norman to describe Blystone's life from childhood until the time of trial. Whiteko recounted that he chose to focus his limited investigation on Blystone's parents because he thought that Blystone had a "good chance

at [establishing] mitigating factors" through their testimony. App. 1145. He believed Blystone's parents to be sincere and thought that they would present a good picture of their son's troubled past. Whiteko never intended to present any testimony at sentencing other than that of Blystone and his parents. Finally, Whiteko explained to the PCRA court that Blystone would not accept a plea to a life sentence because he did not want to spend his life in prison. Thus, it was Whiteko's understanding of his client's instructions that, if convicted, Blystone would not permit him to call witnesses or to beg for mercy at sentencing. App. 1161-64.

Blystone then presented a number of lay witnesses to the PCRA court in order to establish that his life history was replete with potentially mitigating evidence, which Whiteko could have uncovered through a more extensive investigation of his background. First, Blystone's father, Norman, testified in detail about his son's troubled childhood. Norman recounted that Blystone was hit in the head with a steel swing when he was four years old. The accident left him with a large gash on his temple and knocked him unconscious, and afterward, Blystone suffered from recurring headaches, seizures, fevers, and night sweats. Blystone started to have behavioral problems at age six or seven. From the ages of seven to twelve, Norman disciplined him physically for his frequent misbehavior. Norman would typically hit him with a belt and his hand once or twice a week. At times, Norman kicked him on his backside. Blystone's mother would occasionally intervene when she felt Norman's efforts to discipline Blystone were excessive.

Norman informed the PCRA court that, as a child, Blystone developed a nervous habit of pulling out his hair until there was a bald spot. Blystone had no interests or

11

hobbies as a teenager; he ran away from home often; he slept in the closet; he suffered nightmares; he exhibited bizarre behavioral changes; and he made up incredible stories about himself. Blystone was also a risk-taker: he abused alcohol, he engaged in self-mutilation, such as burning himself with cigarettes, and, on one occasion, he rolled under a moving train.

When Blystone was in his late teens, Norman allowed him to live in a cottage on the family property with his girlfriend, Jackie Guthrie. Norman told Blystone that Guthrie had to leave after the couple began having problems. Instead of asking Guthrie to move out, however, Blystone chose to live with her in his car. This occurred shortly before Smithburger's murder. Norman testified that Blystone was regularly under the influence of alcohol during the time leading up to the homicide. Finally, Norman asserted that Whiteko had neither discussed the list of mitigating circumstances with him prior to sentencing, nor asked him whether he knew of other potential witnesses who could offer mitigating evidence.[1]

Blystone's younger sister, Cindy Guthrie,[2] elaborated on Blystone's substance abuse issues during the PCRA hearing, testifying that he used both drugs and alcohol to

---

[1] The parties stipulated that Norma Blystone, Blystone's mother, would provide testimony similar to that of her husband.

[2] For the sake of clarity, Cindy Guthrie is the sister-in-law of Blystone's girlfriend, Jackie Guthrie. App. 1259.

excess. She stated that she never discussed Blystone's behavior with Whiteko prior to sentencing. Rather, her only contact with Whiteko was a brief conversation in the hallway of the courthouse just before sentencing.[3]

Blystone's uncle, Kenneth Blystone, testified that he lived near his nephew in Maryland until Blystone was about fifteen years old. He stated that Blystone appeared normal as a young boy, but later became withdrawn. Kenneth believed that, though Blystone needed help, he was fundamentally a good man. He made clear that he would have testified on Blystone's behalf at sentencing or, at least, discussed the matter with Whiteko, had he been asked to do so.

Lawrence Short, a close friend of Blystone's as a teenager, testified that he and Blystone enlisted in the Navy together at age seventeen. Though the two men went their separate ways after enlisting, they remained in periodic contact for some time. Short knew that Blystone was unable to conform to the discipline required in the Navy, and that this behavioral deficiency resulted in his discharge. Short testified that, during the course of their friendship, he bore witness to Blystone's self-mutilation and substance abuse. He also testified that he heard Blystone tell exaggerated stories about himself. Short, too, would have been willing to testify on Blystone's behalf at sentencing, had he been asked to do so.

---

[3] The parties stipulated that Blystone's other sister, Julie Dice, would have corroborated Cindy Guthrie's testimony and that Whiteko had no contact with Ms. Dice prior to or at the trial.

13

Sharon Smitley testified that Blystone attended her birthday party on the night of the homicide. She stated that Blystone had been drinking and using marijuana at the party, and that she asked him to leave after he became too intoxicated.[4]

Blystone next presented expert mental health testimony to establish before the PCRA court that he suffered from serious untreated brain damage and psychiatric disorders, all of which were aggravated by a history of poly-substance abuse.

Dr. Patricia Fleming, a clinical psychologist and neuropsychologist who has provided expert testimony in numerous death penalty proceedings in both federal and state court, testified that she saw Blystone three times in the month leading up to the PCRA hearing and spent eleven to twelve hours with him. During this time, she interviewed Blystone, administered psychological tests, and reviewed his records, as well as the affidavits of family members. After performing her investigation, Dr. Fleming diagnosed Blystone, to a reasonable degree of medical certainty, with organic brain damage. She stated that physical indicia supporting a diagnosis of brain damage were present from Blystone's infancy: he was a frail baby that did not eat much and suffered from chronic high fever and seizures. The diagnosis of brain damage was further supported by Blystone's early malnutrition, abnormal sleep patterns, irritability, and hyperactivity as a young child. Dr. Fleming also diagnosed Blystone with bipolar disorder. She explained that this

---

[4] Smitley also testified on Blystone's behalf at the 1985 hearing on his post-trial motions.

14

disorder is characterized by major depressive episodes — exemplified by Blystone's habit of sleeping in the closet, his withdrawn behavior, and his self-mutilation — alternating with periods of marked agitation — exemplified by Blystone's bouts of insomnia, frequent exaggerated stories, and abuse of drugs and alcohol. Dr. Fleming further diagnosed Blystone with borderline personality disorder, which is typified by unstable relationships, mood fluctuations, and severe agitation. Finally, Dr. Fleming diagnosed Blystone with poly-substance abuse, which she believed exacerbated his other disorders.

Next, Dr. Alec Whyte, a psychiatrist who has testified in more than 400 criminal trials, testified before the PCRA court. Like Dr. Fleming, Dr. Whyte diagnosed Blystone with borderline personality disorder, bipolar mood disorder, and organic personality disorder caused by physical injury to the brain.[5] Importantly, both doctors agreed that qualified experts had all of the means necessary to arrive at the same diagnoses based upon the information available at the time of trial.

Drs. Fleming and Whyte each testified to a reasonable degree of medical certainty that Blystone's capacity to conform his conduct to the requirements of the law at the time of the homicide was substantially impaired by his mental disorders. Dr. Fleming opined that Blystone was under

---

[5] Dr. Whyte testified that he believed Blystone's brain damage was caused by the serious head injury he sustained at age four. Whether the damage was present at birth, as opined by Dr. Fleming, or caused by early childhood head trauma, both experts agreed that it was irreversibly present after age four.

extreme emotional distress at the time of the murder due to a combination of his disorders and his use of drugs and alcohol. Dr. Whyte similarly thought that the combination of intoxication and Blystone's disorders would have resulted in extreme mental disturbance. Nonetheless, both experts also agreed that, as evidenced by his institutional records, Blystone would not pose a future danger to society if he were to spend the rest of his life in a highly structured environment, such as prison.

Finally, Blystone introduced three types of institutional records, each of which contained potentially significant mitigating evidence, and each of which was available at the time of trial.

Blystone's Navy records indicate that he received an unsuitable discharge primarily because of "[a]pathy and defective attitudes." App. 1495. The records further indicate that "due to the nature of SMSR Blystone's past service and the severity of his present personality disorder, it was the Commandant's opinion that further retention would not have been in the best interests of the Navy." App. 1494. His Navy records reflect a number of problems with his service, such as frequent unauthorized absences and mediocre performance. He received a low mark in "[a]daptability" because he needed "to strengthen his relationship with his superiors and be more conscientious of his military responsibilities." App. 1496. Lastly, the Navy records indicate that he had a burn scar on his right forearm, as well as a gunshot wound on his anterior elbow, and that he had been hospitalized once in connection with an injury near his right eyebrow. Though Whiteko knew that Blystone served in the Navy, he made no effort to obtain these records and, thus, never followed up on their contents.

Blystone also introduced his Maryland Department of Correction Records ("prison records"), which reflect that he received a ten year sentence for robbery in 1979. The prison records consist of both a medical and an administrative section. The medical section of the records indicates that Blystone saw medical personnel frequently from 1980 to 1982, with complaints of fainting, headaches, and vision problems.[6] It also references the scars on his arms, which are suggestive of self-mutilation. The administrative section of the prison records indicates that Blystone exhibited excellent institutional adjustment and that he had no violent episodes while incarcerated. Moreover, Blystone's work supervisor recommended him for parole after he completed less than three years of his sentence because of his superior performance in the prison workforce.

Finally, Blystone introduced the competency evaluation conducted prior to trial by Mayview State Hospital. As indicated by Drs. Fleming and Whyte, the evaluation, though brief, contains psychologically significant information, which arguably should have led Whiteko to investigate Blystone's mental health further for mitigation purposes. The evaluation indicates that Blystone has an I.Q. score placing him in the superior range of intellectual functioning. But it also reflects that he has "anger related to authority figures that is well-entrenched and stems from deep-rooted problems in his familial relationships. He has a high energy level and strong need for immediate gratification." App. 1490. Other test results conducted as part of the

---

[6] Dr. Whyte testified that these physical symptoms are indicative of organic brain damage.

competency evaluation indicate that Blystone periodically suffered from low self-esteem, possessed significant "acting-out potential," had unfulfilled needs for attention, and had marked antisocial ideation.

Both Dr. Fleming and Dr. Whyte agreed that a competency evaluation, particularly one as "disappointingly brief," App. 1357, as the Mayview Report, is of an entirely different nature than a mitigation evaluation. Notwithstanding its brevity, however, both doctors also agreed that the competency evaluation, which counsel had possession of prior to trial, included clinically significant "red flags" that required follow-up with regard to mitigation. They also agreed that all of the tools they used to diagnose Blystone were available at the time of trial and that a qualified expert would have reached the same diagnoses at that time. Whiteko acknowledged at the PCRA hearing that he had read the competency evaluation, but had decided, without the assistance of an expert, that nothing in the report would be useful in developing a mitigation case.

After hearing this substantial body of evidence, the PCRA court denied Blystone's petition. It was persuaded that Whiteko conducted a sufficient investigation into mitigating circumstances by reviewing all of the available discovery materials, including the Mayview Hospital competency evaluation, and interviewing members of Blystone's family. The PCRA court found it significant that neither Blystone nor his family members told Whiteko, when asked, about other potential witnesses that could provide mitigating evidence or indicated that Blystone had substance abuse issues. Notably, the court found Norman Blystone's testimony that Whiteko never posed such questions to him to lack credibility because

18

it was inconsistent with his statement that he could not remember everything about Whiteko's interviews. The PCRA court also discounted Sharon Smitley's testimony as to Blystone's substance use on the night of the homicide because she did not mention Blystone's intoxication when she testified at the 1985 hearing on his post-trial motions.

The PCRA court further concluded that Whiteko could not be deemed ineffective for failing to employ mental health professionals to evaluate Blystone prior to sentencing because Blsytone had no constitutional right to such assistance, and any right that he may have had was protected by the court-appointed doctors who had performed the competency evaluation. It additionally found the testimony of Drs. Fleming and Whyte to be "in large measure irrelevant," because neither doctor knew Blystone at the time of the crimes, and their evaluations were performed long after the homicide occurred. The PCRA court also stated that it could not find counsel ineffective for failing to pursue the purported "red flags" Drs. Fleming and Whyte found in the Mayview Hospital report because the Mayview doctors did not see them as "red flags" for purposes of competency. App. 1645.

On appeal, the Pennsylvania Supreme Court affirmed, stating that "[t]he PCRA court determined that counsel conducted a proper investigation into all possible mitigating circumstances, and we find substantial support in the record to uphold [that] determination." Commonwealth v. Blystone, 725 A.2d 1197, 1206 (Pa. 1999) ("Blystone II"). It further found that Blystone could not succeed in an ineffective assistance of counsel claim because he waived his right to present any mitigating evidence to the jury and, therefore,

could not demonstrate that his counsel's failures, if any, caused him prejudice.

## C.

Blystone filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the District Court in 2000 raising numerous constitutional challenges to his convictions and death sentence. In a lengthy and thorough opinion issued March 31, 2005, the District Court denied relief on all guilt-phase claims, but granted the writ as to the death sentence, concluding that the state court's denial of Blystone's ineffective assistance of counsel claim was objectively unreasonable. Specifically, the District Court found that trial counsel was ineffective in failing to investigate, develop, or introduce expert mental health evidence and institutional records in mitigation, and that Blystone did not waive his right to present all mitigating evidence — at most, Blystone waived presentation of lay witness testimony. The District Court thus held that, on the record presented to the state court, it was unreasonable to conclude that Blystone's waiver prevented him from demonstrating that prejudice resulted from counsel's deficiencies. In addition, the District Court denied (but granted Blystone a Certificate of Appealability on) an additional claim for penalty-phase relief based on trial counsel's failure to investigate adequately and develop lay witness testimony in mitigation.[7]

---

[7] The District Court took pains to note that Blystone raised serious questions about the state court's conclusions with regard to lay witness testimony, and indicated its belief that if Whiteko had obtained Blystone's institutional records and better understood the Mayview Hospital report, he would

20

Blystone filed a timely motion to alter or amend the District Court's judgment pursuant to Federal Rule of Civil Procedure 59(e), claiming to have newly discovered evidence of prosecutorial misconduct relevant to three of his guilt phase claims.[8] By way of this motion, Blystone asked the District Court to grant him leave to conduct discovery of the alleged prosecutorial misconduct, as well as a subsequent opportunity to amend his petition to add new claims, depending upon what the discovery might reveal. Blystone asserted that the three prosecutors who handled his case, as well as the lead investigator, State Trooper Montgomery Goodwin, were central players in recent court proceedings

---

have been able to conduct a more thorough investigation of the mitigating evidence available through lay witness testimony. Though the District Court believed that the state court erred in rejecting this part of Blystone's claim, it could not find the state court's conclusion to be unreasonable.

[8] These are: Claim VII alleging that trial counsel was ineffective in failing to pursue the issue of drug, alcohol, and mental impairment to reduce the degree of guilt to third-degree murder; Claim XV alleging that the Commonwealth violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose that its lead state police investigator had "substantial doubts" about whether Blystone had committed a robbery, which also provided the sole alleged aggravating factor for his death sentence; and Claim XVI alleging that counsel was ineffective for failing to investigate and present exculpatory testimony from George Powell concerning the alleged robbery, as well as evidence supporting guilt-stage defenses to murder.

that exposed a systematic practice of discovery abuses by the Fayette County District Attorney's office around the time of Blystone's trial. These discovery abuses included withholding exculpatory evidence, making undisclosed deals with witnesses, and altering, redacting, or hiding witness statements favorable to the defense. In support of this assertion, Blystone relied primarily upon an October 1, 2004 decision of the Fayette County Court of Common Pleas in Commonwealth v. Munchinski, which granted the defendant a new trial based upon prosecutorial misconduct committed by the same prosecutors who had handled Blystone's case approximately two years earlier. Blystone also obtained an affidavit, dated November 3, 2004, from Trooper Goodwin, then an inmate in state prison, stating that "in cases in which I was lead investigator, documents were altered or changed before they were provided to defense counsel." App. 634. Trooper Goodwin further stated that "it [was] obvious to [him] that there were redactions and alterations" in Blystone's police records, though he declined to explain further for fear of hurting his chances at parole. Id. Finally, Blystone submitted the police records that he believed were redacted or altered, as well as the 1995 Affidavit of Gary Hendrix, the chief investigator for Blystone's post-conviction team, which stated that Miles Miller claimed to have been coerced by the police into wearing a wire to tape his conversation with Blystone, and that the District Attorney's office paid him to testify.

The District Court denied the Rule 59(e) motion to alter or amend judgment, finding that the evidence presented in support was not newly discovered; rather, Blystone had been in possession of all the information upon which he relied in the Rule 59(e) motion well before the District Court issued

22

its judgment on March 31, 2005. The District Court thus concluded that Blystone's motion was dilatory. Moreover, the District Court was persuaded that consideration of the purportedly new evidence would ultimately be futile to Blystone's case because the evidence of his guilt on the first-degree murder and robbery convictions was overwhelming and nothing submitted in support of the Rule 59(e) motion convinced the District Court that it might amend its judgment as to guilt-phase relief.

## II.

The District Court had jurisdiction over this action pursuant to 28 U.S.C. §§ 2241 and 2254. We have appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

Presently before this court is Blystone's timely appeal from the final judgment and order denying his Rule 59(e) motion, as well as the Commonwealth's cross-appeal from the District Court's grant of penalty-phase relief. This Court granted Blystone a Certificate of Appealability ("COA") as to two specific issues related to the District Court's denial of his Rule 59(e) motion. First, we granted review as to whether the District Court abused its discretion in denying Claims VII, XV, and XVI, arising from the guilt phase of Blystone's trial, without first granting him discovery with regard to the alleged newly discovered evidence of prosecutorial misconduct. Second, we granted review to determine whether the District Court abused its discretion in denying Blystone's Rule 59(e) motion insofar as he sought permission to conduct discovery into alleged newly discovered evidence of prosecutorial misconduct and amend his habeas petition to raise previously unavailable Brady claims. In essence, however, Blystone's

23

appeal requires us to answer only one fairly straightforward question: did the District Court abuse its discretion in denying the Rule 59(e) motion?

The Commonwealth's cross-appeal brings two additional issues before us. First, we must determine whether the District Court erred in granting relief on Blystone's claim that trial counsel was ineffective for failing to investigate, develop, or introduce expert mental health testimony and institutional records in mitigation. And, second, we must determine whether the District Court erred in denying relief on Blystone's claim that trial counsel was also ineffective for failing to investigate adequately and develop lay witness testimony in mitigation.

## III.

### A.

As an initial matter, we must ask whether the District Court had jurisdiction to pass on Blystone's Rule 59(e) motion, and whether we, in turn, have jurisdiction to review it on appeal.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), places the federal courts of appeals in the role of "gate-keeper," charging them with the responsibility of "preventing the repeated filing of habeas petitions that attack the prisoner's underlying conviction." Leal Garcia v. Quarterman, 573 F.3d 214, 220 (5th Cir. 2009). Pursuant to this gate-keeping function, AEDPA instructs the courts of appeals to dismiss any claim presented in a second or

24

successive petition that the petitioner presented in a previous application. See 28 U.S.C. § 2244(b)(1). If a petitioner presents a new claim in a second or successive habeas corpus application, we must also dismiss that claim unless one of two narrow exceptions applies:

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Id. § 2244(b)(2)(A)-(B)(ii). "Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." Id. § 2244(b)(3)(A). A petitioner's failure to seek such authorization from the appropriate appellate court before filing a second or successive habeas petition

25

"acts as a jurisdictional bar." United States v. Key, 205 F.3d 773, 774 (5th Cir. 2000).

Our sister Circuits have split on the issue of whether a Rule 59(e) motion to alter or amend judgment that raises a cognizable habeas claim is properly construed as a second or successive habeas petition. If so considered, AEDPA required Blystone to seek this Court's authorization to file the motion before the District Court could properly entertain it and we are, therefore, without jurisdiction to review the District Court's disposition of the motion on appeal. See 28 U.S.C. § 2244(b); see also Gonzales v. Crosby, 545 U.S. 524, 529 (2005) ("Rule 60(b), like the rest of the Rules of Civil Procedure, applies in habeas corpus proceedings . . . only 'to the extent that [it is] not inconsistent with' applicable federal statutory provisions and rules." (alteration in original and footnote omitted)).

Our discussion of this issue necessarily begins with Gonzalez v. Crosby. In Gonzales, the Supreme Court addressed the question of when a federal court should construe a petitioner's motion for relief from judgment pursuant to Rule 60(b) as a second or successive petition subject to the restrictions of AEDPA. 545 U.S. at 526. Noting that "[a]s a textual matter, § 2244(b) applies only where the court acts pursuant to a prisoner's 'application' for a writ of habeas corpus," the Court began its analysis by stating that "it is clear that for purposes of § 2244(b) an 'application' for habeas relief is a filing that contains one or more 'claims.'" Id. at 530 (quotation marks omitted). The Court explained that "[i]n some instances, a Rule 60(b) motion will contain one or more 'claims,'" and "[a] habeas petitioner's filing that seeks vindication of such a claim is, if

not in substance a 'habeas corpus application,' at least similar enough that failing to subject it to the same requirements would be 'inconsistent with' the statute." Id. at 530, 531. This must be so because

> [u]sing Rule 60(b) to present new claims for relief from a state court's judgment of conviction — even claims couched in the language of a true Rule 60(b) motion — circumvents AEDPA's requirement that a new claim be dismissed unless it relies on either a new rule of constitutional law or newly discovered facts.

Id. at 531. Accordingly, the Court held that a Rule 60(b) motion is subject to the restrictions contained in 28 U.S.C. § 2244(b) when it advances one or more "claims."[9]

The Court also explained that "when a Rule 60(b) motion attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings," the motion is not properly construed as advancing a "claim" and is, therefore, not a second or successive petition. Id. at 532. In light of this admonition, the Court went on to provide specific guidance as to when a Rule 60(b) motion advances a "claim" for purposes of AEDPA. Id. at 531-32. For example, "[a] motion that seeks to add a new ground for relief" advances a claim, as does a motion that "attacks the federal court's

---

[9] Prior to Gonzales, this Court held similarly with regard to Rule 60(b) motions in Pridgen v. Shannon, 380 F.3d 721, 727 (3d Cir. 2004).

27

previous resolution of a claim <u>on the merits</u>, since alleging that the court erred in denying habeas relief on the merits is effectively indistinguishable from alleging that the movant is, under the substantive provisions of the statutes, entitled to habeas relief." <u>Id.</u> at 532 (footnote omitted). Similarly, a motion that seeks to present newly discovered evidence in support of a claim previously denied presents a claim. <u>Id.</u>

Blystone's Rule 59(e) motion does not raise any new claims; rather, it seeks only discovery and a subsequent opportunity either to amend the petition to add new claims should they become available, or to present new evidence in support of three of his previously denied claims. Nonetheless, we are convinced that Blystone's Rule 59(e) motion is a habeas corpus petition within the meaning set forth in <u>Gonzales</u>. As the Supreme Court explained, a motion "seek[ing] leave to present 'newly discovered evidence' in support of a claim previously denied" advances a claim and is, therefore, a habeas corpus petition. <u>Id.</u> at 531 (citation omitted). And "by taking steps that lead inexorably to a merits-based attack on the prior" judgment on his habeas petition, <u>Post v. Bradshaw</u>, 422 F.3d 419, 424-25 (6th Cir. 2005), Blystone has made evident his purpose to seek vindication of previously denied claims through the presentation of new evidence. Accordingly, we conclude that Blystone's Rule 59(e) motion advances a claim and is thus a habeas corpus petition.

The pertinent question for our jurisdictional analysis, then, is whether a Rule 59(e) motion to amend or alter judgment is materially different from a Rule 60(b) motion to reconsider, such that it does not constitute a second or successive petition, even if it advances a claim. We now join

28

the Court of Appeals for the Sixth Circuit in answering that question in the affirmative.

As indicated above, Gonzales clearly delineated when a "Rule 60(b) motion should be treated like a habeas corpus application." Gonzales, 545 U.S. at 533. Notably, however, even though "it is well settled that the phrase ['second or successive'] does not simply 'refe[r] to all [habeas] applications filed second or successively in time,'" Magwood v. Patterson, 130 S. Ct. 2788, 2796 (2010) (second alteration in original), Gonzales did not explicitly address the subsequent question in the analytical chain — whether a Rule 60(b) motion, which constitutes a habeas corpus petition, is properly treated as a second or successive one. Instead, the Court effectively assumed that, if a Rule 60(b) motion constitutes a habeas corpus petition, it is necessarily second or successive and, therefore, subject to AEDPA's jurisdictional restrictions. And the reason for such an assumption is rendered immediately evident by the operation of Rule 60(b): Rule 60(b) only comes into play after the time to appeal has expired and the judgment has become final. See Gonzales, 545 U.S. at 528. Accordingly, a Rule 60(b) motion that raises a claim attacking the underlying criminal judgment must be a second or successive petition because, the judgment having become final, the petitioner has expended the "one full opportunity to seek collateral review" that AEDPA ensures. Urinyi v. United States, 607 F.3d 318, 320 (2d Cir. 2010) (quotation marks omitted). In other words, a Rule 60(b) motion is, in substance, both a collateral attack on the first habeas judgment and a new collateral attack on the underlying criminal judgment because Rule 60(b) does not prevent the original habeas judgment from becoming final; instead, it seeks to set aside the already final judgment. See

29

Curry v. United States, 307 F.3d 664, 665 (7th Cir. 2002). This is not so in the case of a Rule 59(e) motion.

Quite to the contrary, a timely Rule 59(e) motion suspends the finality of the judgment by tolling the time for appeal.[10] See Howard v. United States, 533 F.3d 472, 475 (6th Cir. 2008). Accordingly, we cannot logically subject a Rule 59(e) motion to the statutory limitations imposed upon second or successive collateral attacks on criminal judgments because, unlike a Rule 60(b) motion, it is neither a collateral attack on the initial habeas judgment, nor a new collateral attack on the underlying criminal judgment — rather it is part and parcel of the petitioner's "one full opportunity to seek collateral review." Urinyi, 607 F.3d at 320 (quotation marks omitted); see Curry, 307 F.3d at 665. It is for this reason that we agree with the Court of Appeals for the Sixth Circuit that "[t]he purposes behind Rule 59(e), as well as the mechanics of its operation, counsel in favor of the nonapplicability of second-or-successive limitations," even if the motion advances a claim. Howard, 533 F.3d at 474.

Rule 59(e) makes explicit that the district court may continue to exercise the inherent power that it has to rectify its own mistakes prior to the entry of judgment for a brief

[10] We note, however, that a Rule 59(e) motion does not suspend the finality of a judgment for purposes of claim or issue preclusion. See 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4432 (2d ed. 2002) ("[I]t is clear that definitions of finality cannot automatically be carried over from appeals cases to preclusion problems.").

30

period of time immediately after judgment is entered. <u>See White v. N.H. Dep't of Emp't Sec.</u>, 455 U.S. 445, 450 (1982).[11] Viewed against this backdrop, we think it clear that applying AEDPA's limitations on successive collateral attacks to Rule 59(e) motions would unduly interfere with the prompt reconsideration of just-entered judgments. That is to say, it would frustrate Rule 59(e)'s intention to allow the district court to correct obvious errors in its reasoning readily, which in turn "further[s] the important goal of avoiding piecemeal appellate review of judgments." <u>Osterneck v. Ernst & Whinney</u>, 489 U.S. 169, 177 (1989). We are unwilling to attribute to Congress the "unlikely intent" to so impede Rule 59(e)'s operation by way of AEDPA's "second or successive" restrictions. <u>Howard</u>, 533 F.3d at 475.

We are cognizant of the fact that <u>Howard</u> was issued over a strong dissent, which concluded that, while Rule 59(e) motions that seek only "to bring to the attention of a district judge errors[] . . . in the judge's decision on the case as it was put before him" should not be considered second or successive petitions, those based on wholly new claims cannot escape being ruled out by the basic premise of AEDPA "that all habeas claims should generally be brought at one time." <u>Howard</u>, 533 F.3d at 476 (Boggs, C.J., dissenting). Following this reasoning, the Court of Appeals for the Fifth Circuit has concluded that, though technical differences exist between Rule 59(e) and Rule 60(b), in practice the two rules "permit the same relief — a change in

---

[11] This power is entirely "distinct from the power explicitly granted by Rule 60 to reopen cases well after final judgment has been entered." <u>In re Saffady</u>, 524 F.3d 799, 803 (6th Cir. 2008).

judgment," and thus the <u>Gonzales</u> framework should apply equally to both types of motions. <u>Williams v. Thaler</u>, 602 F.3d 291, 303-04 (5th Cir. 2010) (quotation marks omitted).[12] Following this logic, in <u>Williams</u>, the Court of Appeals for the Fifth Circuit opined that a Rule 59(e) motion that advances a claim constitutes a second or successive petition.

We understand the temptation to apply the rule of <u>Gonzales</u> to those Rule 59(e) motions that assert "wholly new claims," <u>Howard</u>, 533 F.3d at 476 (Boggs, C.J., dissenting), since one could argue that such motions are, in effect, new petitions improperly captioned as motions to reconsider. But we, nonetheless, disagree with the Court of Appeals for the Fifth Circuit's holding because we do not believe that the differences between Rules 60(b) and 59(e) are merely technical. To the contrary, as we explained above, we think it is clear that, unlike a Rule 60(b) motion, a Rule 59(e) motion is part of the one full opportunity for collateral review that AEDPA ensures to each petitioner. And we are unwilling to suppose that Congress meant to deny the District Court the first opportunity to rework its newly issued judgment. Thus, we are convinced that a "Rule 59(e) motion, whether or not it should properly be denied on its merits, does not require a

---

[12] In <u>Williams</u>, the court also cited <u>Ward v. Norris</u>, 577 F.3d 925, 935 (8th Cir. 2009), and <u>United States v. Pedraza</u>, 466 F.3d 932, 934 (10th Cir. 2006), as support for the conclusion that AEDPA's limitations on successive petitions apply to Rule 59(e) motions. We do not believe that <u>Ward</u> and <u>Pedraza</u> are helpful, however, because they each concerned Rule 59(e) motions to reconsider the dismissal of Rule 60(b) motions that the district court had determined to be second or successive petitions requiring court of appeals permission.

32

transfer to this court to determine whether the requirements of [AEDPA] are met." Howard, 533 F.3d at 476.

Accordingly, we now join the Court of Appeals for the Sixth Circuit in holding that a timely Rule 59(e) motion to amend or alter a judgment is not a second or successive petition, whether or not it advances a claim, and therefore such a motion lies outside the reach of the jurisdictional limitations that AEDPA imposes upon multiple collateral attacks.

B.

Having determined that the District Court properly exercised jurisdiction over Blystone's Rule 59(e) motion, we turn to the merits of Blystone's challenge to that ruling. We review the District Court's denial of a motion to alter or amend a judgment pursuant to Rule 59(e) for abuse of discretion, "except over matters of law, which are subject to plenary review." Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 272 (3d Cir. 2001).

The scope of a motion for reconsideration, we have held, is extremely limited. Such motions are not to be used as an opportunity to relitigate the case; rather, they may be used only to correct manifest errors of law or fact or to present newly discovered evidence. Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc., 602 F.3d 237, 251 (3d Cir. 2010). "Accordingly, a judgment may be altered or amended [only] if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact

33

or to prevent manifest injustice." Id. (quotation marks omitted) (emphasis added). We have made clear that "'new evidence,' for reconsideration purposes, does not refer to evidence that a party . . . submits to the court after an adverse ruling. Rather, new evidence in this context means evidence that a party could not earlier submit to the court because that evidence was not previously available." Id. at 252. Evidence that is not newly discovered, as so defined, cannot provide the basis for a successful motion for reconsideration. Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985).

The District Court denied Blystone's Rule 59(e) motion, finding that the evidence submitted in support was not in fact newly discovered, since Blystone had possession of it many months before the District Court denied habeas relief.[13] This was plainly not an abuse of discretion under our clearly articulated standards for the assessment of a motion for reconsideration. See Howard Hess Dental Labs., 602 F.3d at 251-52; see also Howard, 533 F.3d at 475 (explaining in the context of a habeas action that "Rule 59(e) motions cannot be used to present new arguments that could have

---

[13] The District Court found, in the alternative, that the new evidence would have no impact on its judgment as to Blystone's guilt phase claims because the evidence of his guilt was overwhelming. This alternative basis was neither essential to the District Court's denial of the Rule 59(e) motion, nor is it necessary to our review.

34

been raised prior to judgment"). We, therefore, decline to upset the District Court's ruling.[14]

---

[14] Blystone makes three other arguments in favor of reversing the District Court's denial of his Rule 59(e) motion, each of which is without merit.

First, relying on Adams v. Gould Inc., 739 F.2d 858, 869 (3d Cir. 1984), he contends that his Rule 59(e) motion was effectively a motion for leave to amend his habeas petition, and that the District Court should have applied the liberal standard used to assess a motion under Fed. R. Civ. P. 15(a). In Adams, the district court denied the plaintiffs' Rule 59(e) and Rule 15 motions, which were filed after we directed the entry of a judgment against the plaintiffs in a § 1292(b) interlocutory appeal. In holding that the district court abused its discretion by denying relief, we stated that the rationale underlying most cases rejecting post-judgment amendments — that the plaintiff should have raised the new theory before trial — did not apply where only an interlocutory judgment had issued. Id. at 868. This case is distinct from Adams in two important respects. First, Blystone did not file a motion seeking to amend his petition; rather, he sought leave to conduct discovery and additional time thereafter in which to move to amend. The District Court, therefore, had no motion to amend before it, and did not err in failing to treat the motion for reconsideration as something it was not. Second, unlike in Adams, the rationale that generally underlies the denial of post-judgment amendments indeed applies here: Blystone should have sought leave for discovery before the District Court adjudicated the petition, given that the "new" evidence was available to him before such judgment was issued.

IV.

We next turn to the District Court's grant of penalty-phase relief.

A.

Because the District Court did not conduct an evidentiary hearing before ruling on the habeas petition, our review is plenary and we conduct our analysis as the District Court did. Marshall v. Hendricks, 307 F.3d 36, 50 (3d Cir. 2002). The state court adjudicated Blystone's ineffective assistance of counsel claim on the merits;[15] thus, our review is

Second, relying on Bracy v. Gramley, 520 U.S. 899 (1997), Blystone argues that the District Court erred in denying the Rule 59(e) motion because he set forth sufficient facts to warrant discovery. Even if Blystone indeed set forth evidence sufficient to warrant discovery had he presented it while his petition was pending, that is a different question than the one before this court — namely, whether the District Court erred in finding that the motion for discovery was dilatory because the evidence presented in support of the Rule 59(e) motion was not newly discovered.

Third, Blystone contends that the District Court abused its discretion because, pursuant to 28 U.S.C. § 2244(d)(1)(D), he had a year from the date on which the "new" evidence could have been discovered through the exercise of due diligence to raise claims thereon. Again, this is a different question than whether the District Court erred in denying the Rule 59(e) motion.

[15] Where a lower state court opinion "represents the state courts' last reasoned opinion on [the relevant issue]," we

36

limited by the mandates of AEDPA. <u>See</u> <u>Adamson v. Cathel</u>, 633 F.3d 248, 254-55 (3d Cir. 2011). As the Supreme Court has made clear, AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." <u>Renico v. Lett</u>, 130 S. Ct. 1855, 1862 (2010) (citation and quotation marks omitted). Accordingly, under AEDPA, our task is only to determine whether the state court's adjudication of Blystone's <u>Strickland</u> claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

---

"look through" the higher state court-opinion and apply § 2254(d)'s standards to the "highest reasoned opinion." <u>Bond v. Beard</u>, 539 F.3d 256, 289-90 (3d Cir. 2008) (citation omitted). Because the PCRA court presented a much more thoroughly reasoned decision than the Pennsylvania Supreme Court on some of the issues involved, we will, at times, analyze the PCRA court's decision, on which the Supreme Court decision heavily relied.

Consistent with Supreme Court precedent, we read § 2254(d) to require three distinct legal inquiries. See, e.g., Harrington v. Richter, 131 S. Ct. 770, 785 (2011). First, we "must inquire whether the state court decision was 'contrary to' clearly established federal law, as determined by the Supreme Court of the United States; second, if it was not, [we] must evaluate whether the state court judgment rests upon an objectively unreasonable application of clearly established Supreme Court jurisprudence." Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 880 (3d Cir. 1999) (en banc). Third, we must ask whether the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented" to the state court. 28 U.S.C. § 2254(d)(2).

As the Supreme Court has explained, a decision by a state court is contrary to clearly established law if it applies a rule that contradicts the governing law set forth in the Court's cases or if it confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from the Court's precedent. See Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

A state court decision is objectively unreasonable "if the state court identifies the correct governing principle from th[e Supreme] Court's decision [] but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Under this standard, "[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied a Supreme Court case incorrectly. Rather, it is the habeas

38

applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner." Price v. Vincent, 538 U.S. 634, 641 (2003) (citations, quotation marks, and brackets omitted). In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). And "the more general the rule at issue — and thus the greater the potential for reasoned disagreement among fair-minded judges — the more leeway state courts have in reaching outcomes in case-by-case determinations." Renico, 130 S. Ct. at 1864 (quotation marks and brackets omitted).

With regard to § 2254(d)(2), this Court has explained that "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless [the state court's findings of fact are] objectively unreasonable in light of the evidence presented in the state-court proceeding." Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004) (quotation marks omitted). "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" Rice v. Collins, 546 U.S. 333, 338-339 (2006) (quoting § 2254(e)(1)); see also Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) ("Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence."). The evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's

adjudication.  <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1401 (2011).

As there is no dispute that the state court applied the correct principle of law to adjudicate Blystone's claim, we may only overturn the state court's decision if it was objectively unreasonable.

B.

Blystone first contends that the state court's denial of his ineffective assistance of counsel claim, as it relates to counsel's failure to investigate and develop expert mental health testimony and institutional records in mitigation, was unreasonable in light of clearly established Supreme Court precedent, and was made in reliance upon unreasonable determinations of the facts.  The District Court agreed and vacated Blystone's death sentence on that basis.  We, too, agree and will affirm the judgment of the District Court.

We evaluate claims of ineffective assistance of counsel using the two-pronged test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To succeed on such a claim, the petitioner must demonstrate (1) that counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) that the petitioner suffered prejudice as a result of the deficiency.  <u>Id.</u> at 687.  To establish prejudice the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.[16]

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010). "[U]nder de novo review, the standard for judging counsel's representation is a most deferential one," Harrington, 131 S. Ct. at 788, and

> [e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating

---

[16] The Commonwealth argues that Blystone's claim for relief depends on this Court's willingness to recognize a new rule — namely, that the principles of Strickland impose upon counsel an obligation to refuse the instructions of a competent client with respect to the presentation of mitigating evidence. But Blystone advocates no such new rule; rather, Blystone argues merely that counsel failed in his predicate duty to investigate, and advise Blystone of, available mitigating evidence prior to sentencing, and that he was prejudiced thereby. The merits of such a claim are "squarely governed" by Strickland. Williams, 529 U.S. at 390.

unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id. (citations and quotation marks omitted).[17]

### 1.

We first turn to the state court's interpretation and application of Strickland's performance prong. Blystone argued unsuccessfully in state court that counsel was deficient in failing to investigate adequately and develop expert mental health testimony and institutional records in mitigation at the sentencing phase. For the reasons set forth below, we can discern no reasonable argument to sustain the state court's

---

[17] Though application of the Strickland test requires a case-specific examination of the evidence, this "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by [the Supreme Court.]" Williams, 529 U.S. at 391. Supreme Court decisions since the issuance of Strickland have shed further light on precisely what is required of counsel in conducting a sufficient investigation prior to sentencing. But such a duty to investigate is certainly encompassed in the mandate of Strickland and has, therefore, been "established" for purposes of AEDPA since the issuance of that decision. See Marshall, 307 F.3d at 99-107.

conclusion that Blystone's lawyer satisfied <u>Strickland</u>'s deferential standard.

Unquestionably, investigation is essential to the lawyer's duties as both advisor and advocate. <u>See</u> 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980).[18] After all, "[t]he effectiveness of advocacy is not to be measured solely by what the lawyer does at the trial; without careful preparation, the lawyer cannot fulfill the advocate's role." <u>Id.</u> Indeed, the "right to present, and to have the sentencer consider, any and all mitigating evidence means little if defense counsel fails to look for mitigating evidence" in the first instance. <u>Hendricks</u>, 307 F.3d at 99 (quotation marks omitted).

"[C]ounsel's general duty to investigate takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death." <u>Id.</u> (quotation marks omitted). "The lawyer . . . has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing." 1 ABA Standards, <u>supra</u>, 4-4.1. And this formidable task "cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant." <u>Id.</u> Rather, the lawyer must make sufficient "efforts to discover <u>all reasonably available</u>

---

[18] As the Supreme Court noted in <u>Wiggins v. Smith</u>, "we long have referred [to ABA standards] as guides to determining what is reasonable." 539 U.S. 510, 524 (2003) (quotation marks omitted).

mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." Wiggins, 539 U.S. at 524 (quotation marks omitted). "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant. . . ." 1 ABA Standards, supra, 4-4.1.

Of course, while much is expected of trial counsel, Strickland also calls for great deference to an attorney's tactical decision to forego particular lines of investigation. And those strategic choices that counsel makes after conducting a thorough investigation of the relevant law and facts "are virtually unchallengeable[.]" Wiggins v. Smith, 539 U.S. 510, 521 (2003) (quotation marks omitted). This does not mean, however, that counsel can insulate his decisions from review merely by calling them strategic, for "choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitations on investigation." Id. (quotation marks omitted). That is to say, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. (quotation marks omitted).

Importantly for our present purposes, this duty to conduct a reasonable investigation of mitigating evidence exists independently of counsel's duty to present a mitigation case to the jury. In fact, the former is a necessary predicate to the latter: if counsel has failed to conduct a reasonable investigation to prepare for sentencing, then he cannot possibly be said to have made a reasonable decision as to what to present at sentencing. As such, "our principal

concern in deciding whether [counsel] exercised 'reasonable professional judgment' is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background <u>was itself reasonable</u>." <u>Id.</u> at 522-23 (citation and brackets omitted).

We need not delve too deeply into the question of whether Whiteko's investigation prior to sentencing was deficient because the Commonwealth's brief all but concedes that it was. <u>See</u> Commonwealth's Reply Br. 10 ("If counsel had persuaded petitioner not to contest the imposition of a sentence of death, then [Supreme Court precedent] would require an evaluation of whether counsel's <u>inadequate investigation</u> tainted his instructions and advice to his client." (emphasis added)). And, for the reasons that follow, we are persuaded that no reasonable argument can be made to support the state court's decision to the contrary.

Notably, the Commonwealth does not dispute that the expert mental health testimony and institutional records presented at the PCRA hearing amount to constitutionally significant mitigating evidence. Nor does the Commonwealth dispute that all of this evidence was readily available to Whiteko at the time of trial, had he looked for it. Thus, the question before us is simply whether any reasonable argument can be made to support the conclusion that counsel's failure to explore these sources of mitigating evidence was not constitutionally deficient.

The PCRA court determined that trial counsel's investigation into expert mental health evidence was adequate

45

because Blystone underwent a competency evaluation at the Mayview Hospital prior to trial and nothing in the resulting report would have suggested to counsel that he should inquire further into Blystone's mental health. We disagree. Indeed, we believe the state court's conclusion in this regard was objectively unreasonable in light of the evidence presented in the proceedings before it.

As the District Court aptly noted, "[i]t is beyond cavil that the scope of an evaluation for purposes of mitigation at a capital sentencing proceeding is far broader than that for competency at trial." District Court Op. 105 (citing Commonwealth v. Basemore, 744 A.2d 717, 738 n.24 (Pa. 2000); Blanco v. Singletary, 943 F.2d 1477, 1503 (11th Cir. 1991)). Thus, the fact that the Mayview Hospital report found Blystone competent to stand trial plainly does not, as the PCRA court's opinion suggests, lead inexorably to the conclusion that the report gave Blystone a clean bill of mental health for purposes of mitigation. In fact, the record before the PCRA court demonstrated quite the opposite. Drs. Fleming and Whyte testified that the Mayview Hospital competency evaluation contained clinically significant "red flags," which a qualified expert would have found to require follow-up prior to sentencing. But counsel never even presented the competency evaluation to an expert, instead determining of his own accord that nothing in the report suggested that Blystone suffered from a mental illness. Notably, nothing was presented to the PCRA court that could have served to undermine the conclusion of Drs. Fleming and Whyte that any qualified expert would have found the contents of the Mayview Hospital report to be clinically significant. On such a record, we conclude that the state court's assertion that the Mayview Hospital report contained

46

no indications of mental illness was an unreasonable determination of the facts.

The state court's decision was similarly unreasonable in reaching the concomitant conclusion that counsel was not ineffective for failing to solicit an independent mental health evaluation because Blystone had no constitutional right to such an evaluation prior to sentencing. Drs. Fleming and Whyte testified that, had the appropriate follow-up investigation of the Mayview Hospital report been conducted, a qualified expert would have had all of the means necessary at the time of trial to diagnose Blystone with organic brain syndrome caused by a childhood head injury, bipolar disorder, and borderline personality disorder. Both doctors believed that the psychological conditions from which Blystone suffered rendered him substantially impaired at the time of the crime and they were of the opinion that a qualified expert would have reached the same conclusion prior to sentencing. Again, nothing was presented to the PCRA court to undermine the opinions of Drs. Fleming and Whyte in this regard.[19] Even assuming that the state court correctly concluded that Blystone had no constitutional right to an independent mental health evaluation prior to sentencing, it was certainly within the trial court's <u>discretion</u> to appoint an

---

[19] The state court dismissed the opinions of Drs. Fleming and Whyte because they did not know Blystone at the time of the offense or at the time of trial. In so doing, the state court ignored the fact that both doctors testified that all of the materials upon which they relied were available at the time of trial and that qualified experts would have reached the same diagnoses at that time.

expert had counsel so requested.  See, e.g., Commonwealth v. Miller, 746 A.2d 592, 605 (Pa. 2000) (Saylor, J., concurring). We believe it clear that competent counsel would have so requested under the circumstances.  Cf. Everett v. Beard, 290 F.3d 500, 509 (3d Cir. 2002) (explaining that a "reasonably competent attorney patently is required to know the state of the applicable law").  The state court's suggestion to the contrary is unreasonable.

Counsel sought to justify further his failure to seek an expert mental health evaluation by explaining to the PCRA court that Blystone wanted "all or nothing" — in other words, he believed his client wanted only to contest his guilt at trial and did not want to present a mitigation case if convicted.[20] This proffered justification, however, relies on an illogical leap:  the fact that Blystone rejected a plea deal offering him life in prison in exchange for an admission of guilt in no way compels the conclusion that he wanted to die if convicted. And, in any event, "[t]he investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered."  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1(C).  Counsel cannot avoid the consequences of his inadequate preparation simply by virtue of the serendipitous occurrence that, on the day of sentencing, his client stuck with the decision not to go forward with a mitigation case.[21]

---

[20] Counsel did not defend his decision not to obtain the institutional records before the PCRA court.

[21] We certainly recognize that

48

With regard to institutional records, we start with the fact that counsel knew prior to sentencing that Blystone had served in the Navy and been incarcerated in Maryland for robbery. Yet, counsel failed even to attempt to acquire records from either institution. The Commonwealth correctly points out that these records contain some information that may have proven unfavorable to Blystone. But they also

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Strickland, 466 U.S. at 691. Still, notwithstanding any statements a defendant may make as to his desire to present a case in mitigation at sentencing, the duty to, at the very least, "explore all avenues leading to facts relevant to . . . the penalty" before sentencing belongs to the lawyer and "exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.). After all, counsel also has a duty to provide advice upon which his client can make an informed decision not to present evidence in mitigation. And counsel cannot fulfill this duty without first knowing what mitigating circumstances may exist. See Hamblin v. Mitchell, 354 F.3d 482, 492 (6th Cir. 2003).

49

contain evidence that plainly corroborates the testimony of Drs. Fleming and Whyte as to Blystone's personality disorder and childhood head injury. Any amount of substantive engagement with this evidence would have spurred competent counsel to further investigate Blystone's mental health. As Supreme Court precedent makes clear, defense counsel has a duty to obtain administrative records, such as those at issue here, as part of the "obligation to conduct a thorough investigation of the defendant's background." Williams, 529 U.S. at 396 (citing 1 ABA Standards, supra, commentary, p. 4-55). We think it abundantly clear that trial counsel fell short of professional standards in failing to explore institutional records in the course of investigating Blystone's background in this case. The state court's conclusion to the contrary reflects an unreasonable application of clearly established federal law. See, e.g., Wiggins, 539 U.S. at 527-28 (finding state court's conclusion that counsel performed adequately, even though he did not fully explore known institutional records, to be objectively unreasonable).

Moreover, counsel's inadequate investigation was clearly not the result of the type of reasoned tactical decision to which we owe deference under Strickland. Indeed, counsel's testimony at the PCRA hearing makes evident that he did not even perform an investigation sufficient to provide the foundation for a reasoned strategic choice as to which avenues of potentially mitigating evidence to pursue. See United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989) ("[C]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made.").

50

We recognize that "[t]he right to counsel does not require that a criminal defense attorney leave no stone and no witness unpursued." Jermyn v. Horn, 266 F.3d 257, 308 (3d Cir. 2001) (alteration in original) (quotation marks omitted). But the Sixth Amendment at least "require[s] a reasoned judgment as to the amount of investigation the particular circumstances of a given case require." Id. (quotation marks omitted); see also Strickland, 466 U.S. at 691. It is evident from the PCRA record that counsel's limited investigation was not the result of any such reasoned judgment, but was merely the consequence of lackluster performance. In other words, we think that "counsel chose to abandon the[] investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." Wiggins, 539 U.S. at 527-28. And we are convinced that there could be no disagreement among "fairminded jurists" that the state court's decision to the contrary was incorrect. Harrington, 131 S. Ct. at 786 ("[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting Yarborough, 541 U.S. at 664)).

2.

Having largely conceded that Whiteko's performance was deficient, the Commonwealth focuses its attention on the prejudice prong of the Strickland test. The Commonwealth argues, as the Pennsylvania Supreme Court found, that Blystone made a "knowing, intelligent, and voluntary," waiver of his right to present any mitigating evidence at sentencing. Blystone II, 725 A.2d at 1205 (noting that Blystone "not only refused to take the stand to testify in

51

mitigation, but he also refused to allow any other mitigating evidence to be presented in his behalf"). Accordingly, the argument continues, Blystone has "failed to demonstrate how counsel's alleged ineffectiveness prejudiced him" because the jury would not have been privy to any additional evidence that Whiteko may have uncovered through an adequate investigation. Id. at 1205 n.20. More specifically, the Commonwealth contends that the relief Blystone seeks is foreclosed by the Supreme Court's decision in Schriro v. Landrigan, 550 U.S. 465 (2007), in which the petitioner, Landrigan, made a similar ineffective assistance of counsel claim based upon an allegedly deficient investigation. A summary of Schriro and its progeny will be of use in explaining why we do not agree that Schriro controls our analysis of this case.

In Schriro, the Supreme Court confronted for the first time "a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing court." Id. at 478. Though Landrigan's counsel had advised his client "very strongly" to allow the presentation of a mitigation case, Landrigan made clear upon questioning from the sentencing judge that he had instructed his counsel, in no uncertain terms, not to present any mitigating evidence. Id. at 469. Indeed, while Landrigan's counsel was proffering to the court the mitigating evidence he would have presented, if so permitted by his client, Landrigan went as far as to interrupt multiple times to explain away the mitigating characteristics of the evidence, and to reaffirm that he did not want the evidence presented in court. Id. at 470. Moreover, Landrigan made it abundantly clear that he understood the consequences of his choice not to present a mitigation case: at the end of the sentencing hearing, he explicitly asked the jury to impose

52

a death sentence, stating "I think if you want to give me the death penalty, just bring it right on. I'm ready for it." Id. (quotation marks omitted). Applying AEDPA's deferential standard of review to these facts, the Supreme Court determined that the state court reasonably concluded that Landrigan had refused to allow the presentation of any mitigating evidence, regardless of its form, and that this refusal prevented him from thereafter demonstrating that counsel's allegedly inadequate investigation resulted in prejudice because no additional mitigating evidence would have come before the jury. Id. at 475-77.

We found Schriro to be controlling in Taylor v. Horn, 504 F.3d 416 (3d. Cir. 2007). In Taylor, the petitioner wrote a confession letter to the police, in which he stated, "I want the maximum sentence." Id. at 421 (quotation marks omitted). At his change of plea hearing, the petitioner confirmed that he had instructed his attorney not to contact any witnesses or to call medical personnel who could testify on his behalf, and that he understood that "the likely result will be imposition of the death penalty." Id. (quotation marks omitted). At sentencing, the petitioner informed the court that he declined to present any mitigating evidence and the court sentenced him to death. Id. at 422. Despite his dogged opposition to the presentation of mitigating evidence, the petitioner filed an ineffective assistance claim in subsequent state post-conviction proceedings based on his counsel's allegedly deficient investigation in preparation for sentencing. The state court denied the claim, finding that the petitioner could not make the necessary showing of prejudice, since he unwaveringly refused to allow his attorney to present any evidence in mitigation, going so far as to personally call potential witnesses to instruct them not to attend his

53

sentencing. Id. at 424. Applying AEDPA's deferential standard of review, we determined in Taylor that the state court's assessment of the facts was reasonable. Id. at 452, 455. Though the petitioner in that case "was not belligerent and obstructive in court like the defendant in [Schriro]," we were persuaded by the record "that his determination not to present mitigating evidence was just as strong." Id. at 455. As a result, we found that "whatever counsel could have uncovered, [the petitioner] would not have permitted any witnesses to testify, and was therefore not prejudiced by any inadequacy in counsel's investigation or decision not to present mitigation evidence." Id.

In the subsequent case of Thomas v. Horn, the Commonwealth relied on Schriro and Taylor to argue that, even assuming that effective counsel would have discovered Thomas's history of mental illness prior to sentencing, no prejudice could have resulted from the inadequate investigation because Thomas would have prevented his counsel from presenting any evidence of his mental illness at sentencing. 570 F.3d 105, 126 (3d Cir. 2009). We rejected this argument,[22] holding that we could not conclude on the record before us that Thomas would have interfered with the presentation of all mitigating evidence, regardless of its form. Id. We explained that Thomas's colloquy at sentencing focused narrowly on whether he wanted to take the stand himself, and did not provide a reasonable basis to conclude, as a factual matter, that he would have refused to present all

---

[22] Unlike in Schriro and Taylor, our review in Thomas was not restricted by AEDPA because the state courts had not addressed Thomas's ineffective assistance of counsel claim on the merits. Thomas, 570 F.3d at 127.

other forms of mitigating evidence as well, had his attorney been prepared to do so.  Id. at 128.  Although we acknowledged that the sentencing court had asked Thomas to confirm that it was his decision not to present "any evidence," we noted that this question was part of a compound question that simultaneously asked Thomas to reaffirm that he did not wish to take the stand in his own behalf.  Id. (quotation marks omitted).  We were convinced that Thomas's "terse answer to [the sentencing court's compound] inquiry does not display an intent to interfere with the presentation of mitigating evidence that is strong enough to preclude a showing of prejudice."  Id.  We similarly concluded that Thomas's response in the negative to the court's question as to whether he had any witnesses to call did not demonstrate that Thomas would have prevented the presentation of mitigating evidence in the form of expert testimony or records.  Id.

The Commonwealth suggests that, like in Schriro and Taylor, Blystone's colloquy with the trial court provides indisputable support for the notion that Blystone would have refused to allow Whiteko to present any mitigating evidence on his behalf — including expert mental health testimony and institutional records — and thereby eliminates the possibility that prejudice might have resulted from Whiteko's deficient investigation.  To this end, the Commonwealth places much stock in Blystone's answer in the negative to the question "Do you wish to testify yourself or to have your parents testify or to offer any other evidence in this case?"  App. 970 (emphasis added).  The fact that Blystone declined to "offer any other evidence," the argument goes, is the beginning and the end of the prejudice inquiry.  We are not so persuaded.

The trial court's colloquy in this case focused almost

55

entirely on whether Blystone wished to take the stand himself or have his parents testify on his behalf. The colloquy was narrowly focused in this manner for an obvious reason: the testimony of Blystone and his parents was the only evidence that Whiteko was prepared to present. As in Thomas, the inquiry upon which the Commonwealth relies was part of a compound question that also asked Blystone to affirm his desire not to take the stand himself or to have his parents testify on his behalf. See 570 F.3d at 128. And as in Thomas, we are of the opinion that Blystone's "terse answer to this inquiry does not display an intent to interfere with the presentation of mitigating evidence that is strong enough to preclude a showing of prejudice" in the manner that the conduct of the petitioners in Schriro and Taylor did. Id. We think that the only reasonable reading of the colloquy indicates that Blystone waived, at most, all lay witness testimony through his statement that he did not want "anybody else brought into it." App. 972. We believe it not only incorrect, but also unreasonable, to infer from the colloquy that Blystone would have prevented counsel from presenting any mitigating evidence, regardless of the form that it took.

The substance of the colloquy, in combination with the testimony presented at the PCRA hearing, does not provide reason to believe that Blystone even understood that any form of evidence other than lay witness testimony could have been offered in mitigation. Though Whiteko testified before the PCRA court that Blystone did not want him "to present anything" at sentencing, App. 1172, glaringly absent from the record is any suggestion that Whiteko ever discussed with Blystone the possibility of considering mitigating evidence other than the testimony of Blystone or his parents. In this

56

regard, we believe that the present case bears little resemblance to Schriro, in which the petitioner was certainly aware that other types of mitigating evidence could be presented on his behalf, since nearly all of the evidence that the petitioner claimed would have been uncovered in an adequate investigation was in fact proffered to the judge — over the interruptions of the petitioner — at sentencing. As the Supreme Court put it, "[i]n the constellation of refusals to have mitigating evidence presented . . . [Schriro] is surely a bright star." Schriro, 550 U.S. at 477 (second alteration in original) (quotation marks omitted). Despite the Commonwealth's extensive arguments to the contrary, the facts of this case are clearly distinguishable from Schriro.

The fact that Blystone chose to forego the presentation of his own testimony and that of the two family members, which counsel was prepared to put on the stand, simply does not permit the inference that, had counsel competently investigated and developed expert mental health evidence and institutional records, Blystone would have also declined their presentation. And unlike the petitioners in Schriro and Taylor, Blystone never behaved in a manner, either prior to or during sentencing, to suggest that such an inference might be appropriate. We therefore "find it impossible to predict with any degree of certainty what [Blystone] would have done had his trial counsel investigated and prepared to present all of the available mitigating evidence that [Blystone] now points to." Young v. Sirmons, 551 F.3d 942, 959 (10th Cir. 2008). We conclude that the state court's belief that it could predict what Blystone would have done was unreasonable. Thus, we agree with the District Court that the state court's determination that Blystone waived the presentation of all mitigating evidence, regardless of its form, was objectively unreasonable in light

of the evidence before it.  In turn, we also conclude that the state court was unreasonable in holding that Blystone's waiver prevented him from making the necessary showing of Strickland prejudice.

Finally, we are convinced that the body of potentially mitigating evidence adduced at the PCRA hearing is sufficient to demonstrate that counsel's deficiencies prejudiced Blystone.[23]  Under Pennsylvania law, "the jury's decision on the [death] penalty must be unanimous." Jermyn, 266 F.3d at 309.  Thus, Blystone "can show prejudice in this case if there is a reasonable probability that the presentation of the [mitigating] evidence . . . would have convinced one juror to find the mitigating factors to outweigh the single aggravating factor the Commonwealth relied upon in this case." Id.

Had counsel's investigation not been deficient, the jury could have heard expert testimony as to Blystone's organic brain damage, bipolar disorder, and borderline personality disorder.  These same experts would have told the jury that, at the time of the crime, Blystone acted under extreme emotional disturbance and suffered from a substantially impaired capacity to conform his conduct to the law.  The jury also would have been told that Blystone can adapt successfully to institutional life and would likely not pose a future danger to society if sentenced to life in prison.

---

[23] Because the state court did not reach the merits of the prejudice prong, the deferential AEDPA standard of review does not apply and we instead review this portion of Blystone's claim de novo.  See Porter v. McCollum, 130 S. Ct. 447, 452 (2009).

58

We are persuaded that the introduction of this evidence "might well have influenced [at least one juror's] appraisal of [Blystone's] moral culpability." Williams, 529 U.S. at 398; see Penry v. Lynaugh, 492 U.S. 302, 319 (1989) ("'[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable . . . to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" (quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring))). We, therefore, agree with the District Court that Blystone has demonstrated a reasonable probability that the result of his sentencing hearing would have been different, had counsel conducted an adequate investigation of mitigating circumstances. Accordingly, we will affirm the District Court's decision to vacate Blystone's death sentence and remand for resentencing.

## C.

Finally, Blystone contends that the state court was unreasonable in rejecting the portion of his ineffective assistance of counsel claim which relates to counsel's alleged failure to investigate adequately and develop lay witness testimony in mitigation. In rejecting this sub-claim, the PCRA court found that counsel "spoke with [Blystone] at length prior to and during the trial about all aspects thereof . . . and interviewed [his] mother and father, as well as one sister, concerning [his] life, from early childhood to the time of trial." App. 1649. The PCRA court also found it significant that neither Blystone nor his family indicated to counsel prior to sentencing that Blystone had substance abuse

issues. Relying on these factual findings, the Pennsylvania Supreme Court upheld the PCRA court's conclusion that counsel had adequately explored lay witness testimony in preparing for sentencing. See Blystone II, 725 A.2d at 1206.

Blystone takes issue with the state court's findings of fact, claiming that nothing in the record suggests that trial counsel adequately interviewed him or his family members regarding the existence of potentially mitigating evidence. Having thoroughly reviewed the record from the PCRA hearing, however, we agree with the District Court that the state court had sufficient testimony before it to support its findings. Although Blystone argues that his family's testimony at the PCRA hearing contradicts counsel's assertions that he thoroughly inquired as to the existence of mitigating evidence, the PCRA court did not credit their testimony. Neither did the PCRA court credit Sharon Smitley's testimony that Blystone was severely intoxicated on the night of the murder. The PCRA court did, however, credit Whiteko's assertions that, to prepare for sentencing, he (1) interviewed Blystone "continuously," (2) interviewed Blystone's father about his son's "childhood, when he was young, very young, until the day of trial," App. 1144-45, (3) spoke with Blystone's mother and sister, and (4) explored the list of statutory mitigating circumstances with Blystone and his parents, inquiring as to whether they knew of anything that might be of use in building a mitigation case. We, like the District Court, are bound by those credibility determinations.

The disparity between the lay witness testimony that counsel was prepared to present at sentencing and that which was elicited at the PCRA hearing suggests that counsel should

60

have engaged in a more extensive investigation prior to sentencing. But, in light of the record evidence and the constraints imposed upon us by AEDPA, we cannot conclude that the state court was unreasonable in finding that counsel's investigation of lay witness testimony satisfied the deferential standard of <u>Strickland</u>.[24] Accordingly, we will affirm the District Court's denial of Blystone's ineffective assistance of counsel claim to the extent that it relates to counsel's investigation and development of lay witness testimony prior to sentencing.[25]

V.

For the foregoing reasons, we will affirm the order of the District Court denying Blystone's Rule 59(e) motion, as

---

[24] The Supreme Court's decision in <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005), does not compel a different result. In <u>Rompilla</u>, counsel's investigation included interviews with Rompilla and some of his family members. The Supreme Court recognized that the adequacy of counsel's investigation into lay witness testimony was subject to debate, but held <u>only</u> that counsel was deficient for failing to examine a court file on the defendant's prior conviction, which was there "for the asking" and which counsel knew would be used to establish an aggravating circumstance at sentencing. <u>Id.</u> at 384.

[25] In affirming this denial, we decide only that the District Court's ruling on this issue of lay witness testimony was not in error under the standards of review set forth by AEDPA. We in no way hold that lay witness testimony cannot be presented at the resentencing hearing.

well as the District Court's judgment vacating Blystone's death sentence and remanding for resentencing.