**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-9006
_____

HUBERT L. MICHAEL,
                                        Appellant
v.

JOHN E. WETZEL, SECRETARY PENNSYLVANIA DEPARTMENT OF
CORRECTIONS; LOUIS FOLINO, SUPERINTENDENT OF THE STATE
CORRECTIONAL INSTITUTION AT GREENE; MARIROSA LAMAS,
SUPERINTENDENT OF THE STATE CORRECTIONAL
INSTITUTION AT ROCKVIEW
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 96-cv-01554)
District Judge:  Honorable John E. Jones III
_____

Argued May 20, 2014

Before:  AMBRO, GREENBERG, and NYGAARD, <u>Circuit</u> <u>Judges</u>

(Opinion filed: June 30, 2014)

Amy G. Donnella, Esquire (Argued)
Timothy P. Kane, Esquire
Billy H. Nolas, Esquire
Federal Community Defender Office for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

Ronald C. Travis, Esquire
Rieders, Travis, Humphrey, Harris, Waters & Waffenschmidt
161 West Third Street

P.O. Box 215
Williamsport, PA 17701

     Counsel for Appellant

Kathleen G. Kane
  Attorney General
Lawrence M. Cherba
  Executive Deputy Attorney General
Criminal Law Division
James P. Barker, Esquire (Argued)
Office of Attorney General of Pennsylvania
Appeals & Legal Services
Strawberry Square, 16th Floor
Harrisburg, PA 17120

     Counsel for Appellee

_____

OPINION
_____

PER CURIAM

Hubert Michael appeals the District Court's order denying the motion he filed pursuant to Federal Rule of Civil Procedure 60(b)(6). For the reasons that follow, we affirm the District Court's order.

Background

The procedural history and factual background of this case are well known to the parties, set forth in our prior opinions—Michael v. Horn, 459 F.3d 411 (3d Cir. 2006), and Michael v. Horn, 476 F. App'x 277 (3d Cir. 2011)—and will not be discussed at length. In 1994, Michael pleaded guilty in the Court of Common Pleas for York County,

2

Pennsylvania to first-degree murder and kidnapping for the shooting death of sixteen-year-old Trista Eng.  At sentencing, Michael stipulated that there were two aggravating factors and no mitigating factors.  As a result, he was sentenced to death.  See 42 Pa. Cons. Stat. § 9711(c)(1)(iv).  On automatic direct appeal, at Michael's request the Supreme Court of Pennsylvania affirmed his conviction and sentence.  Commonwealth v. Michael, 674 A.2d 1044 (1996).  He later authorized the filing of a petition filed pursuant to Pennsylvania's Post Conviction Relief Act (PCRA) in the Commonwealth Court of Common Pleas and a petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Middle District of Pennsylvania.  The District Court stayed the § 2254 petition pending the PCRA proceedings.

In 2001, after completing his PCRA proceedings, see Commonwealth v. Michael, 755 A.2d 1274 (Pa. 2000), Michael sought to terminate his federal habeas proceedings and to remove the Capital Habeas Corpus Unit ("CHCU") as counsel.  Because his counsel from the CHCU challenged his competency, the District Court appointed separate counsel, Joseph Cosgrove, for Michael as well as a psychiatrist, Dr. Robert Wettstein, to perform an evaluation.  In September 2002, the District Court held an evidentiary hearing and conducted a colloquy with Michael concerning the termination of his habeas proceedings.  It subsequently found Michael competent and dismissed his § 2254 petition.  The Court also dismissed the CHCU lawyers and Cosgrove as counsel.  Although the CHCU lawyers had been removed as counsel, they filed a notice of appeal on Michael's behalf.

3

After initially requesting that the appeal be dismissed, Michael decided that he wished to continue with the appeal. We issued a certificate of appealability on whether the District Court violated former 21 U.S.C. § 848(q)(4)(B)[1] in dismissing Cosgrove as Michael's counsel and, if so, whether the error was harmless. When Michael again vacillated on proceeding with the appeal in August 2006, we remanded the matter to the District Court for another competency determination. The District Court found Michael competent and referred the matter back to our Court. In June 2011, we held that any alleged violation of former 21 U.S.C. § 848(q)(4)(B) was harmless and affirmed the District Court's order. Michael, 476 F. App'x at 281. The United States Supreme Court denied certiorari in June 2012 and denied rehearing in August 2012.

Michael's execution was scheduled for November 8, 2012. On September 14, 2012, with Michael's consent, attorneys from the Federal Community Defender Office (FCDO), formerly the CHCU, were appointed to represent Michael. They filed a Fed. R. Civ. P. 60(b)(6) motion on October 24, 2012 to reopen his habeas proceedings in the District Court, arguing that his waiver of habeas review in 2002 was not voluntary. Michael asserted that it was driven by the combination of intolerable prison conditions and his then-undiagnosed Asperger's Disorder.[2] The District Court denied the motion

---

[1] This subsection has been recodified at 18 U.S.C. § 3599(a)(2).

[2] Michaels's expert, Dr. Donna Schwartz-Watts, explained that "[t]he essential features of Asperger's Disorder are severe and sustained impairment in social interaction, and the development of restricted, repetitive patterns of behavior, interests and activities."

4

because it determined that it was actually a second or successive § 2254 petition. In the alternative, it concluded that Michael had not shown extraordinary circumstances. The District Court issued a certificate of appealability, and Michael filed a notice of appeal. We stayed the execution pending the appeal. We have jurisdiction under 28 U.S.C. § 1291.

Whether the Rule 60(b)(6) motion was a second or successive § 2254 petition

Our review of this legal issue is plenary. Pridgen v. Shannon, 380 F.3d 721, 725 (3d Cir. 2004). In Gonzalez v. Crosby, 545 U.S. 524 (2005), the Supreme Court held that a Rule 60(b) motion in a habeas case should be treated as a second or successive § 2254 petition if it advances a claim for habeas relief. The Court clarified that this "is not the case, however, when a Rule 60(b) motion attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings." Id. at 532. Here the District Court cited to a footnote from Gonzalez that it read as excluding Michael's waiver as a possible defect in the integrity of the habeas proceedings: "[W]e note that an attack based on the movant's own conduct, or his habeas counsel's omissions, . . . ordinarily does not go to the integrity of the proceedings, but in effect asks for a second chance to have the merits determined favorably." Id. at 532 n.5. Michael, however, is not asking for a second chance to challenge the District Court's resolution of the merits of his claims, as the District Court has never reached the merits. Rather he is asking to have the merits determined in the first instance.

5

The Commonwealth cites to language in an opinion by the Court of Appeals for the Sixth Circuit to support its contention that Michael's Rule 60(b) motion should be considered a second or successive § 2254 petition: "[A]ll that matters is that Post is 'seek[ing] vindication of' or 'advanc[ing]' a claim by taking steps that lead inexorably to a merits-based attack on the prior dismissal of his habeas petition." Post v. Bradshaw, 422 F.3d 419, 424-25 (6th Cir. 2005). In that case the petitioner sought to reopen his habeas case to pursue discovery that, although allowed by the court, counsel had not performed. Read in isolation, the quoted language would make any Rule 60(b) motion in a habeas case second or successive because the ultimate result the petitioner is seeking is relief on the merits of his claims. However, in Post the petition had already been denied on the merits; thus there was no procedural ruling that had prevented merits review. Post was seeking, in effect, a second chance to have the merits of his claims determined favorably.

Our decision in Blystone v. Horn, 664 F.3d 397 (3d Cir. 2011), also cited by the Commonwealth, is similarly distinguishable. There the petitioner sought to reopen the proceedings to seek discovery to support claims that had already been denied as well as potentially new claims. Id. at 409-10. He had already received merits review of his original claims. Moreover, he brought his arguments in a timely Rule 59(e) motion that we determined was not a second or successive § 2254 petition regardless whether it advanced a claim for relief. Id. at 415.

6

Here the Rule 60(b)(6) motion is not a second or successive § 2254 petition. Michael cannot be viewed as trying to relitigate the merits of his claims because, as noted, the merits of his habeas claims have not yet been reviewed. The thrust of Gonzalez is that a Rule 60(b) motion challenging a non-merits aspect of habeas proceedings is not a second or successive § 2254 petition. With this background, we conclude that the motion was properly brought under Rule 60(b)(6).

Extraordinary Circumstances[3]

We review the District Court's denial of a motion pursuant to Rule 60(b) for an abuse of discretion. Jackson v. Danberg, 656 F.3d 157, 162 (3d Cir. 2011). Under Rule 60(b)(6), the District Court may relieve a party from a final judgment for any reason that justifies relief. The standard for granting a Rule 60(b)(6) motion is a high one. The movant must show "extraordinary circumstances" to justify reopening a final judgment. Gonzalez, 545 U.S. at 536.

> [E]xtraordinary circumstances involve[] a showing that[,] without relief from the judgment, "an 'extreme' and 'unexpected' hardship will result." This "hardship" requirement may sometimes be satisfied when the judgment "precluded an adjudication on the merits." But extraordinary circumstances rarely exist when a party seeks relief from a judgment that resulted from the party's deliberate choices.

Budget Blinds, Inc. v. White, 536 F.3d 244, 255 (3d Cir. 2008) (citations omitted).

---

[3] The parties dispute whether the Rule 60(b) motion was timely filed. Because we conclude that Michael has not shown extraordinary circumstances warranting reopening, we need not reach the issue of whether the Rule 60(b) motion was timely filed.

7

The District Court concluded that Michael had failed to establish grounds for Rule 60(b)(6) relief because changing one's mind is not an extraordinary circumstance. He argues that the District Court's ruling was based on an incorrect assumption that a change in mind can never be an extraordinary circumstance for Rule 60(b) purposes. He also contends that the District Court failed to consider his arguments that he meets the standard because: (1) there has never been merits review; (2) his claims raise significant issues; (3) this is his first habeas petition; (4) this is a capital case; (5) relief is in the public interest; (6) the motion was filed within a reasonable time; (7) there are intervening equities; and (8) his waiver resulted from a combination of prison conditions and a mental disorder.

While the District Court did not explicitly discuss the factors cited by Michael, it is clear from its description of the procedural history of the case that it was aware that there had been no merits review of Michael's first petition in his capital habeas proceedings. The Court referenced the public interest factor when it stated that "[o]ver nineteen years after the heinous murder that [Michael] has admitted committing, it is time to draw this affair to a close." It believed that the Rule 60(b) motion was timely filed. In any event, it was aware of many of the factors Michael believes are relevant.[4]

---

[4] In his reply brief, Michael argues two additional factors that make his circumstances extraordinary: that he never had a trial and trial counsel stipulated to the death penalty. However, the absence of a trial after a guilty plea is not extraordinary, and it was Michael himself who chose to stipulate to the aggravating, and no mitigating, circumstances that led to the imposition of the death penalty.

8

Michael emphasizes the importance of federal habeas review and argues that death is different. He cites to two cases in which capital habeas petitioners received relief pursuant to Rule 60(b)(6). However, the Courts in those cases did not grant relief based simply on the litigants' status as capital habeas petitioners. In each there were other reasons justifying relief. See Thompson v. Bell, 580 F.3d 423, 433 (6th Cir. 2009); Ruiz v. Quarterman, 504 F.3d 523, 525 (5th Cir. 2007).

Change of Mind

Michael argues that a change of mind alone can constitute an extraordinary circumstance. However, the case he cites, Ungar v. Palestine Liberation Organization, 599 F.3d 79 (1st Cir. 2010), does not support that proposition. In Ungar, the District Court had concluded that parties whose strategic choices led to the entry of a default judgment were categorically barred from later obtaining relief pursuant to Rule 60(b)(6). The Court of Appeals decided that relief was not categorically barred and remanded for the District Court to reconsider the Rule 60(b)(6) motion. Notably, the Court stated: "[L]et us be perfectly clear. We do not mean to minimize the gravity of a willful default in calibrating the Rule 60(b)(6) balance. That factor weighs heavily." *Id.* at 86. Thus, the Court of Appeals did not hold that a change of mind alone can support Rule 60(b) relief; rather, it determined that a change in mind was not the only factor to be considered. Moreover, it observed that a willful default should weigh heavily. As noted above, we have stated that extraordinary circumstances rarely exist when the judgment

9

resulted from deliberate choices. <u>Budget Blinds, Inc.</u>, 536 F.3d at 255. In addressing a

waiver of federal habeas review in state court in another capital case, we explained:

> We are in full agreement with the Commonwealth that if a defendant who has participated in a waiver proceeding is then allowed, without exception, to change his mind whenever he chooses, the doctrine of waiver will be rendered purposeless. Moreover, such an indulgence would be bad judicial policy resulting in frequent hearings and the expenditure of untold judicial resources.

<u>Fahy v. Horn</u>, 516 F.3d 169, 187 (3d Cir. 2008). Michael's waiver was a deliberate

choice to discontinue his federal habeas proceedings that weighs heavily when

considering whether extraordinary circumstances exist to reopen the proceedings.

<u>Voluntariness of waiver</u>

Michael asserts that his waiver of federal habeas review resulted from the

combination of prison conditions and his Asperger's disorder and thus was not voluntary.

The Supreme Court has explained that the purpose of the "'knowing and voluntary'

inquiry . . . is to determine whether the defendant actually does understand the

significance and consequences of a particular decision and whether the decision is

uncoerced." <u>Godinez v. Moran</u>, 509 U.S. 389, 401 n.12 (1993) (citation omitted).

In his 2002 report, the District Court's expert, Dr. Wettstein, described the

conditions of Michael's confinement:

> The conditions of his present confinement at SCI Graterford are typical of death row inmates in Pennsylvania, and there is no evidence of extreme sensory deprivation altering his decision-making capacity. He watches cable television in his cell for about eight hours daily, listens to the radio, uses the law library, reads magazines and newspapers provided by other inmates, and exercises religiously in and out of his cell. He receives mail

10

from his girlfriend and others, but refuses visitors. A blower vent provides ventilation to his cell, and the prison was at normal room-temperature during my visits. He did not specifically complain to me about the conditions of his confinement, and indicated on psychological testing that loneliness was his biggest problem.

Dr. Wettstein also noted Michael's reasons for wanting to waive his habeas rights.

He indicated that the death sentence represents a more just outcome with regard to the perspective of the victim and her family than a life sentence, and that "justice calls for the death penalty in my case." He admitted to feeling guilt over committing the homicide but explained that that was not the only reason that he wished to be punished by execution. He admitted that he did not like the limbo and waiting as to whether or not the death sentence would be imposed. He stated that he had his attorneys represent him in the past in his appeals so that there would be no subsequent claims that he was not at those times represented by counsel . . . so as to further limit the issues to litigate.

The question whether Michael's unhappiness with his prison conditions played a role in his decision to waive his habeas proceedings was discussed in the course of his proceedings in the District Court. In its March 2004 memorandum, the District Court quoted Dr. Wettstein's testimony:

His wish is not to remain on death row, because of quality of life issues, because he believes that the death penalty was appropriate in his case. So he wants to expedite the execution in his case. He does not wish to die, otherwise, he does not wish to remain for the rest of his life on death row or for the pendency of any appeals either.

The District Court noted that

Mr. Michael has provided a rational explanation for his desire to discontinue this litigation: his approval of the death penalty as an appropriate punishment for murder, his admission that the murder of Ms. Eng qualifies for the death penalty, his feelings of remorse, and his dissatisfaction with the prospect of life in prison.

11

It found that

> [t]here is no evidence in this case that the conditions of Mr. Michael's death-row confinement are so harsh that his decision can be viewed as the product of coercion. Moreover, the decision has been consistently repeated to this Court over a number of years. It is thus not the product of uncontrollable impulsivity. . . . Mr. Michael's decision "is not the result of an overborne will or the product of an impaired self-determination brought on by the exertion of any improper influences." Comer [v. Stewart, 230 F. Supp. 2d 1016, 1071 (D. Ariz. 2002)].

Thus the District Court considered the possible effect of prison conditions on Michael's decision and found that they did not render it involuntary.

Dr. Wettstein reevaluated Michael in 2007 after we remanded the matter for another competency determination. In his report, he noted that Michael had been transferred and liked SCI-Greene much better than SCI-Graterford because it was newer and cleaner, had air conditioning, and was more tightly operated and controlled. Dr. Wettstein attributed Michael's changes of mind to his "obsessive compulsive personality traits[,] including the need for control, impatience, difficulty trusting attorneys, limited frustration tolerance, and guilt regarding the homicide." He noted that the "conditions of [Michael's] confinement at Graterford with much inmate noise, dirt, and administrative laxity may have also contributed to the vicissitudes of his decision changes." He also mentioned that Cosgrove had raised the possibility of Asperger's Disorder and concluded that it could not be excluded as a diagnosis. Dr. Wettstein determined that Michael was still competent and that "his former decision to waive his appeals—which he held from approximately 1999 through the setting of his execution

12

date in 2004, and from November 2004 through March 2007"—did not reflect "decision-making incapacity or the presence of a mental disorder at the time." Thus, in 2007 Dr. Wettstein acknowledged the possible influence of the prison conditions on Michael's change of mind but did not opine that they overwhelmed Michael to the extent that his decision in 2004 was not voluntary.

In 2012, Michael submitted an affidavit with his Rule 60(b)(6) motion from his former attorney, Mr. Cosgrove, who stated that the prison conditions at SCI-Graterford motivated Michael's desire to waive his appeals; once Michael was moved to the better conditions at SCI-Greene, his desire to litigate his petition did not waver. Cosgrove stated that Michael had been seriously disturbed by the heat, loud noises, and harsh lighting. He asserted that Michael can be very rigid and a minor departure from a rule or routine can upset him more than it should. He suggested that each of Michael's requests to waive his appeals was sparked by a seemingly minor event that troubled Michael, e.g., being given dirty bed linens or learning that a goose he fed in the prison yard had been killed by a fox.

In an affidavit, Dr. Donna Schwartz-Watts, a psychiatrist, opined that Michael has Asperger's Disorder. [5] She believed that Michael's disorder was the primary reason for

---

[5] Michael has also submitted a report from James Aiken, a prison expert, who discusses Michael's positive adjustment to prison. His opinion appears to contradict the basis of the Asperger's Disorder diagnosis.

> My in-person evaluation of Mr. Michael revealed a mature and candid individual. Mr. Michael's ability to handle the often stressful prison environment was of great importance to me. Mr. Michael was able to

his decision to waive habeas review:

> First, because he is unable to process his emotions, he experiences his remorse over killing his victim with equal pain every time he thinks about the crime he has committed. The pain remains fresh for him. Second, the conditions of his confinement at SCI-Graterford were intolerable to him. He found the prison unbearably dirty and the noise level unbearably loud. He felt there was no escape from the noise. Third, his inability to perceive social cues interfered with his ability to establish positive relationships with his counsel for many years and his counsel appears to have believed he was rude and uncooperative, unaware of the true nature of his cognitive impairments. Life for Mr. Michael was filled with painful remorse and, because of his disorder, his existence at Graterford was literally worse than death.

She concluded that "his decisions to waive—to escape his remorse and the intolerable (to him) conditions in prison—lacked volition. His disability made his choices for him."

Thus, while Dr. Wettstein reported that Michael was able to watch TV, read, and listen to the radio in his cell, and did not complain about his conditions of confinement, Dr. Schwartz-Watts reported that Michael found the noise at Graterford unbearably loud and the conditions of his confinement intolerable.[6] Dr. Schwartz-Watts believed that

---

> explain to me, in a calm and mature fashion, the coping skills that he has developed over the years of his incarceration. Age, maturity, and institutionalization have provided Mr. Michael with the skills to avoid and retreat from triggers that can lead to problems in a prison setting. Mr. Michael completely avoids engaging in discussions with other inmates dealing with politics, sports, or any potentially controversial subjects. He does not involve himself in the opinions of others. Simply put, he minds his own business and avoids problems.

While Dr. Schwartz-Watts saw Michael's decision to isolate himself from other inmates as a sign of social impairment that supports a diagnosis of Asperger's Disorder, Aiken saw it as a coping skill developed by a calm and mature inmate.

[6] We have no affidavit from Michael describing the conditions of his confinement or their influence on him.

Asperger's Disorder along with the prison conditions were the cause of Michael's waiver, yet Dr. Wettstein believed that Michael's waiver did not reflect the presence of any mental disorder. The District Court resolved these disagreements in Dr. Wettstein's favor in concluding that Michael's waiver was voluntary. We have no reason to revisit this determination under Rule 60(b).

### Merits of the underlying habeas claims

Michael argues that the merits of his habeas claims weigh in favor of equitable relief. We disagree. At oral argument, Michael's counsel conceded that the claims challenging his conviction have little to no chance of success.

Michael raises two claims challenging his death sentence. First, he argues that the stipulation regarding the aggravating and no mitigating circumstances was false, inaccurate, and prevented the sentencer from giving effect to mitigating evidence. However, Michael's guilty plea to the kidnapping charge established that the killing was committed in perpetration of a felony, and his prior convictions for rape and attempted armed robbery were sufficient to constitute a significant history of felonies involving violence. See 42 Pa. Cons.Stat. § 9711(d)(6) & (9). Only one aggravating factor was needed for Michael to be eligible for the death penalty. While there was certainly *evidence* that could have been presented as mitigation, none of it constituted a mitigating *circumstance* as a matter of law. See 42 Pa. Cons.Stat. § 9711(e). Thus the stipulation regarding aggravating and no mitigating circumstances was not inaccurate or false. This is not a situation where the sentencer was misled.

15

Michael contends that the stipulation precluded the sentencer from considering and giving effect to the mitigating evidence. See Eddings v. Oklahoma, 455 U.S. 104, 113-14 (1982). He asserts that the trial court excluded all possible mitigation from its consideration by accepting the "false" stipulation. However, it was Michael himself who excluded any mitigating evidence from the sentencing court's consideration. While he contends that defense counsel, the prosecutor, and the trial court "arranged" the death sentence, this argument ignores that his then-desire for the death penalty was the driving force behind the stipulation.

In his other sentencing claim, Michael argues that his trial counsel, Bruce Blocher, was ineffective for failing to investigate and develop mitigating evidence and failing to have Michael's mental health evaluated for possible mitigation. He suggests that there were several areas of mitigation, including his abusive childhood, attempted suicide, extreme depression, mood swings and emotional instability, as well as mental and emotional disturbances. However, Michael's proposed mitigating evidence is not as strong as he maintains, and it is not clear whether it would have been uncovered with a reasonable investigation.

While Michael's sister Mary claimed that their father was abusive, his sister Patricia and brother Boyd both denied that their father abused them or Michael. In his 2002 report, Dr. Wettstein noted that Michael "specifically denied that he had been physically abused by his father." Dr. Wettstein testified that

16

Mr. Michael's view is that the sisters were—the sisters who allege that there had been abuse were trying to save his life in the present appeals process, and his view is that there was simply no such abuse. It may have not been a great relationship, but certainly wasn't a physically violent relationship either.

Thus it is questionable whether there was any abuse for counsel to uncover. Moreover, counsel testified that he told the family that childhood abuse would be mitigating but did not get much detail from them.

As for the suicide attempt, it is unclear whether Michael's overdose was a suicide attempt—an escape attempt as Michael described it to Dr. Wettstein—or a manifestation of a personality disorder (as one expert opined). With respect to Michael's mental health issues, the PCRA Court noted that Michael's own expert indicated that Michael did not have a diminished capacity at the time of the offense. Trial counsel related that Michael made a conscious decision to kill the victim, understood what he was doing, weighed his options, and aimed at a vital part of the body because he wanted to kill her humanely. Michael's sister Patricia denied telling PCRA counsel (the CHCU) that Michael had head injuries, severe mood disturbances, behavioral manifestations, severe depression or withdrawal. Michael argued that counsel failed to develop mitigating evidence of his brain damage. However, as discussed below, the expert's opinion that he had brain damage was not persuasive.

Michael also contends that counsel failed to advise him reasonably with respect to his choice not to present mitigating evidence. Counsel testified that Michael expressed a desire to receive the death penalty early on in the case. Counsel related that they had

17

many discussions on the subject and that Michael was aware of the aggravating and mitigating factors a sentencing jury would consider. For mitigation, counsel had developed a strategy of showing that Michael had a normal life and behaved properly in the community until his mother died and he pulled away from his family. Counsel planned to highlight Michael's family's dynamic and his remorse for the crime as shown by his guilty plea. He told Michael about the evidence he had assembled, but the latter continued to say that he did not want evidence presented at sentencing. Co-counsel Arlene Grabaukas testified that Michael was told that Commonwealth might not be able to prove the aggravating circumstances and that he had mitigation to offer.

As for prejudice, it is clear from the record that counsel's mitigation investigation and advice, or alleged lack thereof, were not factors in Michael's refusal to present mitigating evidence. See Taylor v. Horn, 504 F.3d 416, 455 (3d. Cir. 2007).[7] When the sentencing court asked Michael to confirm counsel's representations that they had

---

[7] Missing from Michael's evidence is any testimony from him that he did not understand what mitigation could have been presented and that he would have chosen to present mitigating evidence if counsel had explained the possible mitigating evidence better. When Michael did not testify at the PCRA hearing, the Court asked if counsel had discussed with him that certain gaps would exist in the record as a result of his not providing testimony. Counsel tried to sidestep the issue but the Court asked directly:

> Have you discussed with the Defendant what the standards are for Post Conviction Relief, what it requires, does he understand them and in your judgment making an informed decision not to give testimony based on the fact you carefully advised him what the necessities are or proof at this hearing, and what his testimony may be required for purposes of obtaining relief.

Counsel indicated that the pros and cons of testifying were discussed extensively, and they decided not to have Michael testify.

18

discussed over an extended period of time Michael's wish not to present mitigating evidence, he stated that they had many discussions. At the PCRA hearing, counsel testified that in November 1994, six months before sentencing, Michael wanted a sentencing jury but did not want to present any mitigating evidence. Counsel asserted that he expressed a desire to call witnesses at sentencing as late as March 1, 1995, but we find nothing in the transcript from the hearing supporting that assertion. Counsel argued for a sentencing jury from outside the county, and Michael agreed to discuss the potential mitigating evidence and witnesses with counsel. He did not express a desire to call witnesses. The trial court had to encourage Michael to cooperate with counsel with respect to mitigation and allow counsel to speak with family members. At the District Court hearing in 2002, Dr. Wettstein testified that Michael told him that it was at his insistence that he pleaded guilty and waived sentencing. He told Dr. Wettstein that, if he received a new trial, he would again plead guilty, stipulate to the aggravating factors, and waive mitigating evidence.

As noted above, Michael conceded at oral argument that the claims challenging his conviction have little chance of success. We agree.

Michael argues that there were significant indicia that a competency evaluation was needed and that trial counsel was ineffective for failing to have him evaluated.[8] At

---

[8] In order to have been considered competent, Michael must have had "a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and also "a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam).

the PCRA hearing, Blocher testified that he believed Michael was competent based on their discussions on how the criminal justice system works and how to pick a jury. He asserted that Michael understood the nature of the trial, the function of a jury, and how the proceeding would have two phases. Blocher stated that he would not have let Michael plead guilty if he thought Michael was incompetent. Experts for both Michael and the Commonwealth testified at the PCRA hearing regarding his competency. The Commonwealth Court rejected the conclusion of one of Michael's experts that he was incompetent as "totally unsupported by the totality of the evidence." After being told of the details of Michael's confession to trial counsel of what happened during the homicide, another of Michael's experts opined that Michael was not incompetent to stand trial. The PCRA Court concluded that it would find Michael competent even if the Commonwealth had to prove it beyond a reasonable doubt.[9] We note that Michael has been found competent twice by Commonwealth Courts and twice by the District Court.

Michael also alleges ineffective assistance of counsel with respect to his guilty plea. First, he asserts that counsel never investigated the case, developed a theory of defense, or investigated a mental health defense. Blocher testified at the PCRA hearing that, when they first met in September 1993, Michael gave him a very detailed

---

[9] As additional proof of his competency, the PCRA Court pointed to Michael's escape from jail by impersonating another inmate as well as his participation in a separate trial on a charge of rape.

description of what had happened the day of the murder.[10] Blocher felt prepared for trial: "[B]ased upon what he told us, there wasn't a whole lot of witnesses to call on the factual issues of the trial." At the PCRA hearing, Blocher explained how he might have challenged Boyd's credibility. Co-counsel Grabaukas testified at the PCRA hearing that the defense team was prepared to go forward and had reviewed the case and charges with Michael at length. While Michael argues that counsel assumed that he had killed the victim, he ignores the detailed confession he gave counsel at their first meeting.

Michael contends as well that counsel did not investigate mental health defenses. Blocher testified that there was nothing in Michael's confession to him that indicated Michael did not know what he was doing at the time of the murder, noted that Michael made a conscious decision to kill the victim, understood what he was doing and weighed his options, and aimed at a vital part of the body because he wanted to kill her humanely. When the details of Michael's confession were described to him, Michael's own PCRA expert concluded that Michael was not insane and did not suffer from diminished capacity at the time of the offense.

---

[10] Blocher testified that Michael told him that he went to Trista Eng's house to look at a chair that was for sale and decided to rape her. After she asked him for a ride to work, Michael took some electrical cord he found in order to tie her up. He drove a while, pulled over, and tied her up. He told Eng he intended to rape her. After they drove some more, they stopped. Michael untied her, and they had sex. Michael thought for some time about whether he should kill her. He decided he had to kill her but wanted to do it humanely by aiming at vital parts of her body. He shot her in the heart from the front and then from the back after she fell forward. He then shot her in the head and dragged her body into some bushes.

In July 1994, Michael told counsel that his first version of events was not true and that his brother Boyd had lied about Michael's confession. Michael asserts that counsel rejected this second version of events without investigation and threatened to testify against him. Blocher explained to Michael that, if he wanted to present that story, he could testify but that Blocher could not ask him questions. Before trial, Michael changed his position and did not want to present that version of events. Blocher denied that he ever indicated that he would testify against Michael at trial if he got a new attorney and presented the second version of events. As noted by the PCRA Court, Michael never supported this claim with any testimony. While Michael implies that counsel threatened to testify against him at trial, the citations he provides in support are two brief references to testimony at a PCRA or disciplinary hearing.

Finally, Michael claims that Blocher failed to advocate for him when he tried to withdraw his guilty plea. However, he does not suggest what counsel should have argued other than it would be "fair and just" to allow Michael to withdraw his plea.

Conclusion

Michael has not shown that the District Court abused its discretion in denying his Rule 60(b)(6) motion. He has not demonstrated extraordinary circumstances justifying reopening his habeas proceedings. It is not extraordinary that Michael did not receive merits review of his first capital habeas petition after he knowingly and voluntarily waived habeas review. His expert's disagreement with Dr. Wettstein and the District

22

Court regarding whether his waiver was voluntary is not an extraordinary circumstance. The merits of his habeas claims do not weigh in favor of reopening the proceedings.

For these reasons, we affirm the District Court's judgment. The stay of execution pending appeal entered November 8, 2012 is vacated.