**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3997
_____

RONALD CLARK,
                    Appellant

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS;
SUPERINTENDENT GRATERFORD SCI;
DISTRICT ATTORNEY PHILADELPHIA;
ATTORNEY GENERAL PENNSYLVANIA

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 2-10-cv-03164)
District Judge: Hon. Edward G. Smith
_____

Argued: March 15, 2017
_____

Before: GREENAWAY, JR., SHWARTZ, and GREENBERG, <u>Circuit Judges</u>.

(Filed: April 24, 2017)

Aren K. Adjoian, Esq.  [ARGUED]
Eric Motylinski, Esq.
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

        Counsel for Appellant

Joshua S. Goldwert, Esq.  [ARGUED]
Susan E. Affronti, Esq.
Ronald Eisenberg, Esq.
George D. Mosee, Jr. Esq.
R. Seth Williams, Esq.
Philadelphia County Office of the District Attorney
3 South Penn Square
Philadelphia, PA 19107

      Counsel for Appellees

_____

OPINION[*]
_____

SHWARTZ, <u>Circuit Judge</u>.

Ronald Clark was convicted of first-degree murder, criminal conspiracy, and possession of an instrument of crime in connection with the shooting of Aineis Sunn Life at the Wayne Junction Deli in Philadelphia on October 7, 1993.  Clark filed a habeas petition, asserting that his trial counsel was ineffective for failing to: (1) probe an eyewitness's drug use and purported recantation of her identification; (2) introduce testimony of the fiancée of another eyewitness to discredit that witness's testimony; and (3) present testimony of his employer to support his alibi defense.  The District Court denied his petition.  Even assuming that these failures made his counsel's performance deficient, Clark has not shown that he was prejudiced by them.  We will therefore affirm.

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

I

A

On October 7, 1993, Life and Clark exchanged words inside the deli at around 9:30 p.m. Clark left the deli briefly, returned with a shotgun, and shot Life in the head.

There were two trials. The first resulted in a hung jury. At both trials, the prosecution presented three eyewitnesses: Kevin Pettiway, Sherry Taggart, and Nijel Bell.

Pettiway testified that he was with Life on the day of the murder. In the evening, he and Life went to the deli. While waiting in the deli, Pettiway noticed Clark standing behind Life and heard Life say, "Can you back up off of me?" App. 728. Clark responded, "Oh, it's like that," and then left the store "in a hurry." App. 729. Pettiway stated that within two minutes of leaving the store, Clark returned with an umbrella that had a shotgun inside it. Clark put the shotgun to the back of Life's head, said "What you got to say now, motherfucker?" and pulled the trigger. App. 737.

Taggart testified that she worked for the deli, and while she was sweeping the parking lot on the evening of October 7, she noticed a man walk by with an umbrella and enter the store. Taggart observed that man in the deli, whom she identified as Clark in a photo array after the shooting, put a gun to Life's head,[1] say "what the 'F' you say now?" and then shoot Life in the head. App. 885. She ducked behind a car but observed Clark

_____

[1] Taggart said she recognized Life because she had known him for approximately three years.

walk out of the deli carrying the umbrella. Taggart then went to Life's aunt's house and informed her of the shooting.

Bell testified that at around 9:00 p.m., he and Kevin Dwight (Clark's co-defendant) had a conversation in a playground near the deli. Bell knew that Dwight carried a shotgun in an umbrella and had it with him that night. Several minutes after speaking with Dwight, Bell walked down the street to his fiancée, Nicole Shaffer, but then stepped away from her to have another conversation with Dwight. Bell noticed Clark when Clark was walking at a fast pace away from the deli. Bell saw Clark whisper in Dwight's ear, Dwight hand Clark the umbrella, and Clark walk quickly back toward the deli. Bell testified that he then heard a shotgun blast and observed Clark running from the deli, mumbling something as he passed him, umbrella in hand. Bell entered the deli and saw that Life had been shot. The next day a woman left a shotgun on Bell's doorstep, which a ballistics expert confirmed was the murder weapon.

Shaffer did not testify but made a statement to the police following the shooting. She explained that she saw Dwight with the umbrella and shotgun but did not see Clark or see Dwight hand the umbrella to him. She said that she was with Bell around the time of the shooting, but was not with him at every moment because Bell went across the street to speak with others, and she went inside a nearby house to use the bathroom.[2]

Clark asserted an alibi defense. He presented testimony from his housemates who said that they were at home with Clark throughout the evening of October 7, drinking,

---

[2] Shaffer also confirmed that a shotgun was delivered to Bell's house, and that it was the same shotgun Dwight had in an umbrella the night of the shooting. She also said that Dwight had the umbrella before the shooting but did not have it after the shooting.

playing chess, and celebrating a job offer Clark received that day to work at the Rittenhouse Hotel. The parties stipulated that Clark interviewed at the hotel on October 6 and began working there on October 11.

Jeffrey Berger, the Director of Employment and Benefits at the hotel, was not called as a witness, but Clark now claims that his attorney should have called him to corroborate his alibi. Berger submitted a declaration to the PCRA court in which he stated that he called Clark's reference on October 7, but did not state that he conveyed the offer that day. He said that his practice was to convey a job offer on the same day as he completed the reference check. Accordingly, Berger said "it would have been consistent with my practice to have called Ronald Clark on October 7, 1993 to offer him the position." App. 1622.

### B

Clark raised several issues on direct appeal, including claims for ineffective assistance of counsel, but the Pennsylvania Supreme Court affirmed his conviction and sentence. Commonwealth v. Clark, 710 A.2d 31, 42-43 (Pa. 1998). The United States Supreme Court denied certiorari. Clark v. Pennsylvania, 526 U.S. 1070 (1999).

Clark filed a pro se habeas petition pursuant to the Pennsylvania Post-Conviction Relief Act ("PCRA") seeking reversal of his conviction. The PCRA court denied his request[3] and the Pennsylvania Supreme Court affirmed.[4] Clark filed a 28 U.S.C. § 2254

---

[3] The PCRA court vacated Clark's death sentence.

[4] There was no intermediate appellate review because the denial of PCRA relief in death penalty cases is directly appealable to the Pennsylvania Supreme Court. See 42 Pa. Cons. Stat. Ann. § 9546(d); Commonwealth v. Marshall, 947 A.2d 714, 719 (Pa. 2008).

petition, which was denied. We granted a certificate of appealability on whether trial counsel was ineffective for failing to (1) investigate and present evidence related to Taggart's alleged drug use at the time of the murder and identification of Clark; (2) present Shaffer's testimony; and (3) call Berger instead of stipulating about the dates concerning Clark's employment at the hotel. We will next review the state courts' and District Court's rulings on these issues before examining the issues ourselves.

1

Clark asserts that his trial counsel was ineffective for failing to investigate and introduce evidence about Taggart's drug use. Before the PCRA court, Clark presented a declaration from Taggart in which she stated that she was arrested a few days after Life was shot, and she told a detective that she was "high and drunk" when Life was shot and had not slept during the days before the shooting. App. 1577. Taggart explained that she did not really know who the shooter was or get a good look at him because she was under the influence of drugs and alcohol at that time and because she had ducked behind parked cars. Her declaration also said she was forced to testify, and lie, about Clark—including about identifying him in the photo array—and she "felt so bad" about it that she sent a letter to Clark's mother telling her that she "was [a] junkie and the police made [her] say what [she] said." App. 1579.

Between trials, Clark's mother received a letter purportedly from Taggart in which Taggart apologized and said she was a drug addict, she did not know if Clark murdered Life, and that officers told her they thought Clark was the murderer. Clark's mother sent

his trial counsel the letter. Neither the letter nor Taggart's allegedly extensive drug use were mentioned at trial.

The PCRA court held an evidentiary hearing and considered testimony from Taggart, Clark's trial counsel, and the prosecutor. When presented with the letter to Clark's mother, Taggart testified that it was her handwriting and signature on the letter but, contrary to her declaration, she said that she did not remember writing it, did not know Clark's mother, and did not know how she got her address. She explained that she did not remember because it had been seven-and-a-half years since the trials and she was a drug addict and alcoholic at the time of the murder and Clark's trial, and sleep-deprived before the shooting. Although she did not remember anyone contacting her on Clark's behalf between the two trials, she noted that someone must have come to her house for her to write the letter. Taggart also stated that she "vaguely" remembered the shooting but she was "not really" able to identify the shooter "because [she] didn't see his face," App. 1419, and did not hear anything inside the store that night because she was working outside in the lot. She did confirm, however, that she saw the shooter with an umbrella.

Clark's trial counsel testified about both Taggart's alleged substance abuse and his decisions concerning the letter. As to her substance abuse, trial counsel testified that he did not notice anything about Taggart at any proceeding that indicated she was under the influence of alcohol or drugs and that if he "did glean something, [he] would have jumped all over it." App. 1484. The prosecutor also testified that at no time did Taggart seem intoxicated or under the influence of drugs. With respect to the letter, Clark's trial counsel testified that he made a strategic decision not to question Taggart about the letter,

7

which suggested Taggart knew Clark, because it would undermine his misidentification theory, which was premised on Taggart not knowing him. He also testified that if he had confronted Taggart with the letter after she had just identified Clark, there was "potential for her to say that she was threatened or forced to write this letter, and [he] didn't want that in front of the jury." App. 1482.

Based on this testimony, the PCRA court concluded that trial counsel was not ineffective concerning any failure to investigate or cross-examine Taggart about her drug use. The court determined that, apart from Taggart's own testimony at the evidentiary hearing, Clark "presented no evidence to support the claim Taggart was addicted to crack cocaine and alcohol and that her perceptions were so clouded that she would not have been able to reliably identify Clark as the shooter on the night of the murder," App. 1524-25, and his claim was rebutted by his trial counsel's and the prosecutor's testimony because neither noticed anything unusual about Taggart's demeanor. The court also found that the trial record did not indicate that the trial judge noticed anything unusual about Taggart's demeanor at trial. With respect to the letter, the court found that Taggart "did not willingly and independently write the recantation letter," and trial counsel's strategy of misidentification justified not introducing the letter. App. 1523. In addition, the court found that Clark failed to show that the letter would have changed the verdict because Pettiway and Bell positively identified Clark as the shooter, so Taggart's testimony was unnecessary to convict.

The Pennsylvania Supreme Court upheld the PCRA court's findings. Regarding Taggart's drug use, the Supreme Court found that her letter did not assert she was under

the influence of drugs on the night of the murder, and found "no basis to afford relief on this issue." Commonwealth v. Clark, 961 A.2d 80, 88 (Pa. 2008). As to the letter, the Court concluded that the PCRA court's finding was "amply supported" because Taggart could not recall writing the letter, testified that she did not know Clark's family at the time, and essentially admitted that she did not write the letter on her own because she testified that someone would have prompted the letter. Clark, 961 A.2d at 87. The Pennsylvania Supreme Court also upheld the finding that trial counsel's decision not to use the letter at the second trial was sound strategy.

The Magistrate Judge found that the state court did not unreasonably apply Strickland because Clark failed to show a reasonable likelihood of a different result if his attorney had investigated Taggart's drug use before the second trial. In particular, the Magistrate Judge questioned whether the jury would have accepted that Taggart was a drug addict and intoxicated while at work where there was no contemporaneous corroboration of her drug use, such as a history of drug-related arrests, and she did not appear to counsel or the judge to be under the influence of drugs. As to the letter, the Magistrate Judge opined that, "[a]s was developed in the PCRA process through the evidentiary hearing . . . , the statements made in [Taggart's] letter were far from reliable and were worthy of little credit." App. 39. Thus, the judge concluded that trial counsel's failure to investigate the letter could not have been prejudicial because there was no indication that Taggart would have testified in accordance with the letter. For these reasons, the Magistrate Judge recommended denying relief based on Taggart's purported substance use and the letter.

9

With respect to the claim that counsel was ineffective for failing to call Shaffer at trial, the PCRA court held that Clark provided no evidence that she was willing to testify. Moreover, he failed to show that her testimony would have advanced his defense because her "testimony that she did not see something did not contradict Bell's testimony, which was found reliable by the jury." App. 1522. The Pennsylvania Supreme Court agreed, and further noted that Taggart and Pettiway corroborated Bell's testimony.

The Magistrate Judge recommended denying relief on this claim as well, concluding that Clark did not show prejudice. Shaffer's testimony may have undermined Bell's, the Magistrate Judge noted, but two other witnesses—Taggart and Pettiway—testified that Clark left the deli and returned with the umbrella. Thus, the Magistrate Judge concluded it was not unreasonable for the state court to find that the jury was unlikely to absolve Clark based on the testimony that Shaffer saw Dwight but not Clark holding the umbrella outside the deli.

The PCRA court also held that relief was not warranted on Clark's alibi claim because it could not have reasonably caused a different outcome at trial. The PCRA court found that Berger would have testified only that his normal course of business was to offer a job (or turn down an applicant) on the same day the applicant's references were checked, but he could not say that he actually offered Clark the job on October 7. The stipulation, the PCRA court found, "would allow a similar inference to be made about the

date of the job offer if the jury was inclined to believe the alibi defense despite all of the eyewitness testimony." App. 1528.

The Pennsylvania Supreme Court likewise denied relief on this issue, reasoning that the inference Clark sought could have been drawn from the stipulation, and in any case, the event that he asserted he was celebrating was ancillary to his defense. The court also concluded that Clark failed to establish prejudice because he did not explain how proof of a job offer would have changed the verdict.

The Magistrate Judge concluded that the state court did not unreasonably apply Strickland because the witness, Berger, "would only have been able to add that October 7th might have been the date that Clark received notification of his hire," App. 65 (emphasis in original), and thus his declaration did not establish that Clark received his job offer on October 7th.

4

The District Court adopted each of the Magistrate Judge's findings and denied Clark's petition without an evidentiary hearing. Clark appealed, and this Court granted a certificate of appealability on three claims of ineffective assistance.

II[5]

A

The District Court did not hold an evidentiary hearing on Clark's claims, and so our review of its decision is plenary. See Blystone v. Horn, 664 F.3d 397, 416-17 (3d

---

[5] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254(a). We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

Cir. 2011). Because the state ruled on the merits of Clark's ineffective-assistance-of-counsel claims, we may grant relief only if the state court's adjudication of Clark's claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Blystone, 664 F.3d at 417. Clark argues that the state courts' decisions on his claims were contrary to and unreasonable applications of clearly established federal law, and based on unreasonable determinations of fact. Thus, we must undertake "three distinct legal inquiries." Blystone, 664 F.3d at 417. "First, we must inquire whether the state court decision was contrary to clearly established federal law, as determined by the Supreme Court of the United States." Id. (internal quotation marks omitted). "A state court decision is 'contrary to' clearly established federal law if it (1) 'applies a rule that contradicts the governing law' set forth in Supreme Court precedent or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different' from that reached by the Supreme Court." Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 280 (3d Cir. 2016) (alteration in original) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). "[S]econd, if [the state court decision] was not [contrary to Supreme Court precedent], we must evaluate whether the state court judgment rests upon an objectively unreasonable application of clearly established Supreme Court jurisprudence." Blystone,

12

664 F.3d at 417 (citation, internal quotation marks, and alterations omitted). "A state court decision is objectively unreasonable if the state court identifies the correct governing principle from the Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id.[6] "Third, we must ask whether the state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court." Id. (citation and internal quotation marks omitted). This "requires [us to] review . . . whether there was sufficient evidence to support the state court's factual findings." Dennis, 834 F.3d at 281. We must defer to a state court's factual determinations because, under § 2254(e)(1), such determinations are presumed to be correct, and a habeas petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see also Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000).

We evaluate Clark's ineffective assistance of counsel claims under Strickland v. Washington, 466 U.S. 668 (1984). Accordingly, Clark must show that (1) "counsel's performance was deficient," which "requires showing that counsel made errors so serious

---

[6] Under this standard, "[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied a Supreme Court case incorrectly." Price v. Vincent, 538 U.S. 634, 641 (2003) (citations and alterations omitted). "Rather, it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner." Id. (citations and alterations omitted). "In other words, a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Blystone, 664 F.3d at 417-18 (internal quotation marks and alterations omitted). Put differently, the "state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) "the deficient performance prejudiced the defense," id. at 687, which requires the petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.

B

1

We first address Clark's claims that the state courts' decisions were contrary to Strickland. Specifically, Clark argues that the Pennsylvania Supreme Court applied the wrong standard for ineffective assistance of counsel claims by seemingly focusing on whether the evidence, if it had been presented, "would . . . have affected the verdict," Clark, 961 A.2d at 93, rather than whether "the result of the proceeding would have been different" but for counsel's "unprofessional errors," Strickland, 466 U.S. at 694. Clark's challenge is meritless. While the Pennsylvania Supreme Court used a shorthanded description of the standard at one place in its opinion, both that court and the PCRA court recited and used the correct standard. See Clark, 961 A.2d at 85 (the Pennsylvania Supreme Court stating that "[o]ur longstanding test for ineffective assistance of counsel derives from the standard set by the United States Supreme Court in Strickland . . . . [A] petitioner must prove that: (1) the underlying legal claim is of arguable merit; (2) counsel had no reasonable strategic basis for proceeding as he did; and (3) there is a reasonable likelihood that, but for the challenged act of counsel, the outcome of the proceedings would have been different"); App. 1519-20 (the PCRA court stating that "[i]n Strickland . . . the United States Supreme Court established the legal principles that

14

govern claims of ineffective assistance of counsel. To prevail, the defendant must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. . . . To show prejudice, the defendant must demonstrate that there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the trial could have been different"); see also Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (accepting state court's "occasional shorthand reference to th[e] [Strickland] standard by use of the term 'probable'"). Thus, the state courts' decisions were not contrary to clearly established federal law.

2

We now turn to Clark's argument that the state court decisions were unreasonable applications of Strickland and the PCRA court made unreasonable determinations of fact.

We first examine whether trial counsel was ineffective for failing to investigate and present evidence regarding Taggart's drug use around the time of the murder and the identification of Clark. As Clark notes, counsel has an obligation to investigate the case and explore relevant facts, see Rompilla v. Beard, 545 U.S. 374, 387 (2005), and counsel's performance may be deficient if he or she fails to do so, see Showers v. Beard, 635 F.3d 625, 632 (3d Cir. 2011). Even if Clark's trial counsel should have investigated Taggart's purported drug use, Clark has not rebutted the PCRA court's findings that the evidence did not show Taggart was under the influence of drugs or alcohol on the night of the shooting such that she could not identify Clark. While the PCRA court had Taggart's declaration in which she described her drug and alcohol use, it also heard her

testify, judged her credibility, and concluded that her alleged substance use did not affect her identification of Clark or her testimony at trial.

Moreover, even if trial counsel's failure to deeply probe Taggart about her drug use was deficient, it was not prejudicial. First, trial counsel thoroughly cross-examined Taggart, including about her drug use and its impact on her ability to perceive and recall events. See App. 892 ("Q. Let me ask you. Were you under the influence of any narcotics on the evening that this incident had occurred? A. No."). Second, and more important, even if Taggart's testimony would have been completely undermined by her drug use, two witnesses, Pettiway and Bell, observed Clark at the deli, carrying an umbrella or shooting Life.

With respect to counsel's failure to confront Taggart with the letter in which she purported to recant her identification, we cannot say counsel acted ineffectively. Among other things, trial counsel was concerned that Taggart might testify that she was forced to write the letter by those associated with Clark, which could shed a guilty light on Clark. Although the letter suggested her regret for identifying Clark, and her PCRA declaration suggested she wrote the letter because she felt bad about testifying that Clark was the shooter, her PCRA testimony did not embrace that position. Indeed, she claimed she had no memory of being asked to write the letter and that someone must have asked her to write it. Thus, she seemed to distance herself from the letter. Had counsel confronted Taggart with the letter at trial, and had she testified at trial as she did at the PCRA hearing, the jury could have been left with the impression that someone associated with Clark caused her to write the letter. In light of such testimony, presenting the letter could

16

have had the effect of suggesting that Clark's supporters were seeking to influence Taggart's testimony. Trial counsel thus had good reason not to mention the letter. Finally, even if Taggart had recanted, the jury had the testimony of Pettiway and Bell upon which to conclude that Clark shot Life.

For these reasons, we cannot say the state court unreasonably concluded that Clark did not show that he received ineffective assistance of counsel regarding Taggart's alleged drug use or the letter. Clark has not shown a "reasonable probability" that the result of the proceedings would have been different had counsel investigated and examined Taggart about her substance abuse or if he had introduced the letter at the second trial. See Strickland, 466 U.S. at 694.

3

The state courts also properly denied relief on Clark's claim that trial counsel was ineffective for failing to present Shaffer's testimony. The state courts correctly found that Shaffer's proposed testimony did not actually contradict Bell's. As the Pennsylvania Supreme Court noted, that Shaffer did not see Dwight hand the umbrella to Clark does not mean that Bell did not observe it. Moreover, Shaffer's testimony corroborated aspects of Bell's testimony, including the fact that Dwight did not have the umbrella after the shooting, lending support to Bell's testimony that Clark had it. Furthermore, as that Court observed, Taggart and Pettiway corroborated Bell's testimony about Clark's presence at the deli, carrying an umbrella and shooting Life. Thus, even if the jury heard testimony from Shaffer regarding whether she saw Clark with the umbrella or shoot Life, there is no reasonable probability that the result of the proceeding would have been

different, given the testimony from those who actually observed events that she was not in a position to see. As a result, Clark has failed to demonstrate prejudice based on the absence of Shaffer's testimony.

4

The state courts' rulings on Clark's claim that his counsel was not ineffective for failing to call the hotel alibi witness and for stipulating to the dates he was interviewed for and began his new job were also sound. Clark's alibi defense was that, on the night of the October 7 shooting, he was celebrating receiving a job offer with his two housemates. As the PCRA court and Pennsylvania Supreme Court found, the inference Clark sought from Berger's proposed testimony—that Clark received the job offer on October 7 (and had reason to celebrate)—could be drawn from the stipulation. Moreover, even if Berger had testified, he would not have been able to confirm that Clark actually received the offer on the 7th, but only that extending the offer that day would have been "consistent with [his] practice," App. 1622, and would have been subjected to cross-examination that, as a result of his inability to provide a specific date, would have shown that the offer could have been conveyed on any day between October 6, when he interviewed, and October 10, the day before he started work, and would have undermined his assertion that he and his friends were celebrating a job offer he allegedly received on October 7. Finally, and most significantly, even if Berger testified that he conveyed a job offer to Clark on October 7, this would not rule out that Clark was at the deli at the time of Life's murder. Thus, the state courts' decisions were not based on unreasonable determinations of fact, and the courts correctly concluded that Berger's testimony would not have

18

affected the outcome at trial.  Accordingly, Clark has failed to show prejudice on this ineffectiveness claim.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687, 694.

## III

For the foregoing reasons, we will affirm.